319 P.3d 298

STATE of Hawai'i, Respondent/Plaintiff–Appellee–Cross–Appellant,

v.

Robert J. McKNIGHT, Jr., Petitioner/Defendant–Appellant–Cross–Appellee.

No. SCWC–28901.

Supreme Court of Hawai'i.

Dec. 31, 2013.

Benjamin E. Lowenthal, Wailuku, for petitioner.

David M. Louie, Attorney General; Kimberly Tsumoto Guidry, First Deputy Solicitor General; Marissa H.I. Luning, Deputy Solicitor General, for respondents.

McKENNA, J., with whom RECKTENWALD, C.J., NAKAYAMA, and ACOBA, JJ., and Circuit Judge TRADER join.

## OPINIONS OF THE COURT

### INTRODUCTION

On July 24, 2006, Robert J. McKnight, Jr. ("McKnight") was charged via indictment with Count 1, Electronic Enticement of a Child in the First Degree, in violation of Hawai'i Revised Statutes ("HRS") § 707–756 ("Electronic Enticement"), and Count 2, Promoting Child Abuse in the Third Degree, in violation of HRS § 707–752(1)(a). The charges were severed, and the State of Ha-

wai'i ("State") proceeded to trial on Count 1. After a jury trial in the Circuit Court of the Second Circuit ("circuit court"),[1] McKnight was convicted of Electronic Enticement.

McKnight appealed his conviction for Electronic Enticement, and the State cross-appealed the suppression of certain evidence, including a statement made by McKnight after he was arrested and evidence seized from his residence pursuant to a misdated search warrant. Some of this evidence pertained to the untried charge of Promoting Child Abuse in the Third Degree. The Intermediate Court of Appeals ("ICA") affirmed McKnight's conviction and vacated the circuit court's suppression order.

McKnight raises three questions on certiorari, printed in the order addressed:

[1]. Did the ICA gravely err by disregarding the plain and unambiguous language of a criminal statute and holding that proof that the defendant used a computer or other electronic device was not part of each element of the offense?

2. Did the ICA gravely err in holding that Mr. McKnight waived his right to counsel after he asserted his constitutional and statutory rights and the police made no effort to find a lawyer, denied his right to contact his mother, and wanted to question him further?

[3]. Did the ICA gravely err when it created a new exception to Hawai'i's exclusionary rule by holding that the use of evidence seized pursuant to an invalid warrant does not violate the right to be free from unreasonable searches, seizures, and invasions of privacy guaranteed by the Hawai'i Constitution?

Pursuant to the analysis below, we affirm in part and vacate in part the ICA's Judgment on Appeal, and remand this case for further proceedings consistent with this opinion.

### A. Factual Background

The charges against McKnight stemmed from an undercover investigation conducted by the Department of the Attorney General.

---

1. The Honorable Joel E. August presided.

During the investigation, McKnight began communicating via internet chat with "Chyla Bautista" (" 'Chyla' "), a persona created by Special Agent Vincente Domingo ("Agent Domingo") of the Hawaiʻi Internet Crimes against Children Task Force. "Chyla" identified herself as a fifteen-year-old girl on Oʻahu. Over the course of a month, McKnight communicated with "Chyla" via Yahoo!! Messenger ("Yahoo"), email, cellular telephone, and home telephone. During these conversations, McKnight discussed meeting with "Chyla" and performing sexual acts with her. He also emailed "Chyla" photographs of himself and displayed himself to "Chyla" masturbating via webcam.

On July 5, 2006, McKnight communicated with "Chyla" via Yahoo to discuss meeting her in person. McKnight purchased an electronic airline ticket and arranged to fly "Chyla" from Honolulu to Maui the following day. He provided "Chyla" with the flight information, told her that he would pick her up from the airport, and gave her a description of his car. On July 6, 2006, the Maui Police Department and the Hawaiʻi Attorney General's Office observed McKnight's car entering Kahului Airport at the scheduled arrival time and placed McKnight under arrest for electronic enticement of a child.

At the Wailuku Police Station, Agent Domingo advised McKnight of his *Miranda* rights and asked him to complete a constitutional rights form (AG Form CR–1). McKnight stated that he wanted an attorney and initialled "Yes" next to a question that read "Do you want an attorney now?" Agent Domingo ceased the interview and left the room to confer with Agent Woletta Kim ("Agent Kim") regarding whether he could ask McKnight for a description of his residence. The agents, who intended to obtain a search warrant for the residence, concluded that such questioning was permissible because it did not involve interrogating McKnight about the case. Agent Domingo returned to the interview room minutes later with the intention of further questioning McKnight.

When Agent Domingo re-entered the room, McKnight asked to call his mother, but Agent Domingo denied the request.[2] McKnight asked what was going to happen next, and Agent Domingo responded, "[W]e are going to do a search warrant on [your] residence."[3] At that point, McKnight stated that he had changed his mind about giving a statement because he had not realized the severity of the crime.

As Agent Domingo began tape-recording their dialogue, however, McKnight again asked if he could call his mother. Agent Domingo responded that he could not promise anything, and it was entirely McKnight's decision whether he wanted to give a statement. The transcript reveals the following exchange:

ROBERT J. MCKNIGHT, JR.: . . . . Now, will—after this is done, will you allow me to call my mother?

SPECIAL AGENT DOMINGO: Again, I'm not going to promise you anything. [ ] If you want to give a statement or not, that's strictly up to you. . . . I can't promise you anything. There's no promises or guarantees, okay, at this stage.

ROBERT J. MCKNIGHT, JR.: Okay.

SPECIAL AGENT DOMINGO: Do you still want to talk to me?

ROBERT J. MCKNIGHT, JR.: Not unless I go let my mother know.

SPECIAL AGENT DOMINGO: Again, I can't promise you anything . . . . I can't say, okay, I will—I will let you do this if you give me a statement. . . . There's no promises, no guarantees. If you want to give me a statement—like you told me that, you know, you changed your mind because you didn't realize the severity of the crime, then fine. But, again, I can't promise you anything. You have got to tell me what you want to do, Robert.

2. Upon further questioning, Agent Domingo acknowledged that McKnight could have requested an attorney or asked his mother to hire an attorney; however, he did not know McKnight's reasons for wanting to call his mother, and he was concerned that McKnight would ask his mother to dispose of evidence before agents could obtain a search warrant.

3. Agent Domingo admitted that a search warrant had not yet been prepared but their intention was to apply for one.

ROBERT J. MCKNIGHT, JR.: Go ahead.

. . . .

SPECIAL AGENT DOMINGO: Go ahead what?

ROBERT J. MCKNIGHT, JR.: Continue.

(Emphasis added).

When McKnight agreed to continue, Agent Domingo presented him with a second constitutional rights form, on which McKnight indicated that he did not want an attorney and that he wanted to give a statement. After McKnight completed this form, Agent Domingo proceeded to question McKnight about his conversations with "Chyla" and his intention to meet with her.

That afternoon, Agent Domingo prepared a search warrant for McKnight's residence and vehicle. He presented the warrant application and his affidavit to Judge Simone Polak of the District Court of the Second Circuit. After finding probable cause, Judge Polak signed the warrant, which authorized agents to search McKnight's residence and vehicle for evidence of Electronic Enticement, and to seize computers and electronic storage media (e.g., hard drives, modems, digital files, electronically stored records, computer programs, and photographic equipment). The warrant stated: "This warrant may be served and the search made on or before July 16, 2006, a date not to exceed ten (10) days from the issuance of this search warrant[.]" In a clerical error, however, Judge Polak misdated the warrant as having been signed by her on June 6, 2006.[4]

Agents executed the search warrant that same day at McKnight's residence and seized, among other things, two computer hard drives, thirty-five floppy disks, and twenty-two DVDs. Subsequent imaging of the hard drives revealed approximately one hundred and fifty-five electronic images and two movies of suspected child pornography, archived files of conversations between McKnight and "Chyla," and graphic files of McKnight displaying his genitals.

## B. The Charge and Trial

The Circuit Court of the Second Circuit granted McKnight's pretrial motions to suppress the statement he gave after invoking his right to counsel and evidence seized pursuant to the misdated search warrant ("Suppression Order").[5] After its motion to sever the charges was granted, the State proceeded to trial on Count 1, Electronic Enticement in the First Degree, and appealed the court's Suppression Order as it related to Count 2, Promoting Child Abuse in the Third Degree.

At the conclusion of the trial on the Electronic Enticement charge, the court gave the following jury instruction, over McKnight's objections:[6]

Fact, Conclusions of Law and Order Granting Defendant's Motion to Suppress Statement as Involuntary and Granting Defendant's Motion to Suppress Evidence Seized Pursuant to Invalid Warrant. With respect to the warrant issue, the circuit court stated that there was probable cause for the search warrant, but suppressed the evidence seized because of the misdating of the warrant pursuant to the ICA's holding in *State v. Endo*, 83 Hawai'i 87, 924 P.2d 581 (App.1996), discussed infra.

---

4. The June 6, 2006 date in the jurat was handwritten by Judge Polak upon issuing the warrant, while the July 16, 2006 date in the final paragraph had been typed by Agent Domingo when he prepared the search warrant application.

5. On October 25, 2006, McKnight Filed a Motion to Suppress Statement as Involuntary, on the ground that Agent Domingo had violated his right to counsel, and a Motion to Suppress Evidence Seized Pursuant to Invalid Warrant, on the ground that the warrant was not supported by probable cause. The State filed memoranda in opposition to both motions; and the court conducted an evidentiary hearing on December 8, 2006. After this hearing, McKnight alerted the court to the error in the date on the search warrant and filed a Supplemental Memorandum in Support of his Motion to Suppress Evidence. The State filed a Memorandum in Opposition to Defendant's Supplemental Memorandum, arguing that the issuance date was merely a clerical error and that the warrant should be upheld under the good faith exception. On February 1, 2007, the circuit court issued its Findings of

6. McKnight objected on the grounds that the jury should not be instructed as to Sexual Assault in the Third Degree, and that the State must prove beyond a reasonable doubt that the character "Chyla" was below the age of 16. He did not argue, however, that Electronic Enticement required the State to prove that he used a computer or electronic device to agree to meet with "Chyla" and to travel to the agreed-upon meeting place at the agreed-upon time; in addition, his own proposed jury instruction did not extend this computer-use requirement to the three conduct elements of the offense.

In the indictment, Defendant Robert McKnight is charged with the offense of electronic enticement of a child in the first degree.

A person commits the offense of Electronic Enticement of a Child in the First Degree if he intentionally or knowingly uses a computer or any other electronic device to intentionally or knowingly communicate with another person, who represents that person to be under the age of eighteen years, with the intent to promote or facilitate the commission of Sexual Assault in the First Degree or Sexual Assault in the Third Degree, and intentionally or knowingly agrees to meet with another person who represents that person to be a minor under the age of eighteen years, and intentionally or knowingly travels to an agreed upon meeting place at an agreed upon meeting time.

There are five material elements of the offense of Electronic Enticement of a Child in the First Degree, each of which the prosecution must prove beyond a reasonable doubt.

These five elements are:

1. That on or about the 13th day of June 2006, to and including the 6th day of July, 2006, in the County of Maui, State of Hawaii, Defendant[ ] intentionally or knowingly used a computer or other electronic device; and

2. That the Defendant intentionally or knowingly used a computer or other electronic device to communicate with another person, who represented that person to be under the age of eighteen years; and

3. That Defendant communicated with the other person with the intent to promote or facilitate the commission of Sexual Assault in the First Degree or with the intent to promote or facilitate the commission of Sexual Assault in the Third Degree; and

4. That the Defendant intentionally and knowingly agreed to meet with another person who represented that person to be under the age of eighteen years; and

5. That the Defendant intentionally or knowingly traveled to an agreed upon meeting place at an agreed upon meeting time.

A person commits the felony offense of Sexual Assault in the First Degree if he knowingly engages in sexual penetration with a minor who is at least fourteen years old but less than sixteen years old and the person is not less than five years older than the minor and the person is not legally married to the minor. . . .

A person commits the felony offense of Sexual Assault in the Third Degree if he knowingly engages in sexual contact with a minor who is at least fourteen years old but less than sixteen years old or causes a minor who is at least fourteen years old but less than sixteen years old to have sexual contact with him, and the person is not less than five years older than the minor, and the person is not legally married to the minor. . . .

(Emphasis added.)

A jury found McKnight guilty as charged of Electronic Enticement. The circuit court entered its judgment of conviction and sentence of probation on November 14, 2007 ("Judgment"). McKnight appealed this Judgment.

C. Appeals to the ICA

1. McKnight's Appeal from the Judgment

On appeal, McKnight argued for the first time that the circuit court plainly erred in failing to instruct the jury that the State was required to prove that he used a computer or electronic device to accomplish each of the three elements of Electronic Enticement, including agreeing to meet with "Chyla" and traveling to Kahului airport.[7]

7. McKnight also argued on appeal that the circuit court abused its discretion in permitting the jury to view scenes of him masturbating for "Chyla" via web cam, and that there was insufficient evidence to support his conviction because the State failed to prove that he used a computer or other electronic device to travel to the airport to meet "Chyla." The ICA held that the court did not abuse its discretion in allowing the jury to view the videos, and McKnight's claim regarding insufficiency of the evidence was without merit. McKnight did not challenge these por-

The State argued, inter alia, that McKnight's interpretation of the statute would be contrary to legislative intent and lead to an absurd result because it was not possible to travel via a computer and anyone who traveled to a meeting via car, airplane, or foot would be immune from prosecution. The State did not explain how imposing a computer-use requirement on the agreement to meet would render the statute absurd.

In response, McKnight contended that the plain language of the statute required the use of a computer or electronic device as to every element, and that this interpretation was not absurd because the State could have convicted him if he had used a computer to purchase an airline ticket to travel to Oʻahu to meet with "Chyla."

### 2. State's Appeal from the Suppression Order

In its appeal from the Suppression Order, the State argued that the court erred in suppressing McKnight's statement because McKnight had initiated communication with Agent Domingo, and had voluntarily and knowingly waived his *Miranda* rights before being questioned. In addition, it maintained that Agent Domingo's failure to make any efforts to contact an attorney and his denial of McKnight's requests to contact his mother did not amount to a violation of McKnight's constitutional or statutory rights. The State also argued that the court erred in suppressing evidence seized pursuant to the misdated search warrant because the error had been committed by the issuing judge rather than law enforcement agents, McKnight was not prejudiced where the search was otherwise supported by probable cause, the public's interest in obtaining evidence of crimes against children outweighed the marginal benefits of suppressing such evidence, and a

narrow application of the good faith exception was warranted under such circumstances.

McKnight, on the other hand, argued that his statement was not voluntarily given because he had unequivocally invoked his right to counsel, his inquiry as to what was going to happen next did not evidence a desire to reinitiate a discussion regarding the investigation, and Agent Domingo's statement about executing a search warrant was reasonably likely to elicit an incriminating response. McKnight also argued that the error in the issuance date of the search warrant rendered it invalid, and execution of the warrant constituted an invasion of his right to privacy.

### 3. The ICA's Opinion

In a published opinion, the Intermediate Court of Appeals ("ICA") affirmed McKnight's conviction under HRS § 707–756, vacated the circuit court's Suppression Order, and remanded the case for further proceedings.[8]

With respect to McKnight's appeal, the ICA concluded that the circuit court did not plainly err in failing to instruct the jury that HRS § 707–756 required the State to prove that McKnight used a computer or other electronic device to agree to meet "Chyla" or to travel to the agreed-upon meeting place at the agreed-upon time. It concluded that construing the statute otherwise would lead to illogical and inconsistent results by limiting application of the statute to atypical situations.

With respect to the State's appeal, the ICA overruled its prior decision in *State v. Endo*, 83 Hawaiʻi 87, 924 P.2d 581 (App.1996),[9] and concluded that a clerical error in the issuance date of the search warrant did not require

tions of the ICA's Opinion on certiorari and, therefore, we do not address them in our decision.

8. The ICA consolidated McKnight's appeal from the Judgment and the State's appeal from the Suppression Order under ICA No. 28901.

9. In *Endo*, a police officer erroneously typed the date of April 14, 1992 on a search warrant he presented to a judge for signature on May 14,

1992. 83 Hawaiʻi at 88–89, 924 P.2d at 582–83. The ICA held that misdating the warrant rendered it invalid, noting, inter alia, that Hawaiʻi Rules of Penal Procedure Rule 41(c) required the search warrant to "command the officer to search within a specified period of time not to exceed ten (10) days[,]" and that the warrant commanded the officer to search "for a period not to exceed ten (10) days from its issuance." *Id.* at 92–94, 924 P.2d at 586–88.

suppression of evidence seized pursuant thereto because suppressing the evidence under such circumstances would neither deter governmental misconduct or protect citizens' privacy rights in such circumstances. In addition, the ICA concluded that McKnight's custodial statement to Agent Domingo should not have been suppressed because, although McKnight had earlier invoked his right to counsel, he then reinitiated communication with agents and voluntarily waived his *Miranda* rights.

PART I: HRS § 707–756 DOES NOT REQUIRE THE STATE TO PROVE THAT MCKNIGHT USED A COMPUTER OR ELECTRONIC DEVICE TO TRAVEL TO THE AGREED–UPON MEETING PLACE OR TO AGREE TO MEET WITH "CHYLA"

(By: McKenna, J., with whom Nakayama and Acoba, JJ., join)

We construe the Electronic Enticement statute pursuant to established principles of statutory construction, and hold that the State was not required to prove that McKnight used a computer or other electronic device either (1) to travel to the agreed-upon meeting place at the agreed-upon time, or (2) to agree to meet with a person representing him- or herself to be under the age of eighteen years. We therefore affirm McKnight's conviction for Electronic Enticement under HRS § 707–756.

At the time pertinent to this case, HRS § 707–756 (Supp.2006) provided, in relevant part:

(1) Any person who, using a computer or any other electronic device:

(a) Intentionally or knowingly communicates:

(i) With a minor known by the person to be under the age of eighteen years;

(ii) With another person, in reckless disregard of the risk that the other person is under the age of eighteen years, and the other person is under the age of eighteen years; or

(iii) With another person who represents that person to be under the age of eighteen years; and

(b) With the intent to promote or facilitate the commission of a felony:

(i) That is a murder in the first or second degree;

(ii) That is a class A felony; or

(iii) That is an offense defined in section 846E–1;

Agrees to meet with the minor or with another person who represents that person to be a minor under the age of eighteen years; and

(c) Intentionally or knowingly travels to the agreed upon meeting place at the agreed upon meeting time; is guilty of electronic enticement of a child in the first degree.

(Emphasis added).[10]

McKnight argues that a conviction for Electronic Enticement requires the State to prove that he used a computer or other electronic device not only to communicate with a person who represents him- or herself to be under the age of eighteen years, but also (1) to travel to the agreed-upon meeting place at the agreed-upon meeting time, and (2) to agree to meet the minor, with the intent to promote or facilitate the commission of a felony under HRS § 846E–1. The State, on the other hand, maintains that HRS § 707–756 cannot be interpreted to require the use of a computer or electronic device to travel to a meeting place, because such a construction would create an absurd result, inconsistent with the legislature's purpose.

 "The interpretation of a statute is a question of law reviewable de novo." *State v. Kotis*, 91 Hawai'i 319, 327, 984 P.2d 78, 86 (1999) (citation, brackets, and ellipses omitted). We view HRS § 707–756 as a whole and construe the statute in accordance with the legislature's overall purpose to give each part a sensible and intelligent effect. *State v. Davis*, 63 Haw. 191, 196, 624 P.2d 376, 380 (1981). Based on the analysis below, we

**10.** The current version, HRS § 707–756 (Supp. 2012), contains the same language except subsection (1)(b)(iii) has been amended to read: "That

is another covered offense as defined in section 846E–1." In addition, the word "and" between subsections (1)(a) and (1)(b) has been removed.

conclude that: (1) requiring the use of a computer or other electronic device to travel to the agreed-upon meeting place at the agreed-upon time would render the statute absurd in meaning; and (2) requiring the use of a computer or other electronic device to agree to meet with the minor would render the statute structurally incoherent as a whole. We hold that, with respect to the computer-use requirement, the State was required to prove that McKnight used a computer or electronic device only to communicate with "Chyla"; therefore, the circuit court did not plainly err by not instructing the jury that the State must prove McKnight used a computer or electronic device to agree to meet with "Chyla" and to travel to the agreed-upon meeting place at the agreed-upon time.

## A. Legislative History of HRS § 707-756

▆▆▆▆ "When construing a statute, [this court's] foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Kotis*, 91 Hawai'i at 327, 984 P.2d at 86 (citation omitted). In addition, "we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose." *Id.* (citation omitted). In determining the purpose of a statute, the court may look to the relevant legislative history to discern the underlying policy, which the legislature sought to promulgate. *State v. Wells*, 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995).

[W]e have rejected an approach to statutory construction which limits us to the words of a statute, for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination. Thus, the plain language rule of statutory construction does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to

promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.

*Keliipuleole v. Wilson*, 85 Hawai'i 217, 221, 941 P.2d 300, 304 (1997) (citations, brackets, and ellipses omitted).

HRS §§ 707-756 and -757 were first introduced as House Bill 2426 during the 2002 legislative session. The articulated purpose of these statutes was "to deter crimes against minors by . . . creating two new offenses of first and second degree electronic enticement of a child, which prohibit the use of a computer or other electronic device to lure a minor to a meeting with intent to commit a felony[.]" H. Stand. Comm. Rep. No. 417, in 2002 House Journal, at 1399 (emphasis added). Specifically, the legislature expressed a concern regarding the predatory use of computers to target children, and it found that existing laws failed to address the use of new technologies to entice children into meetings for the purposes of committing crimes against them. S. Stand. Comm. Rep. No. 2867, in 2002 Senate Journal, at 1384. It noted, however, that one method of investigation which had proven successful for targeting such crimes was the use of sting operations in which a police officer posed as a minor in chat rooms or e-mail communications with the sex offender. *Id.*

The Senate Standing Committee explained,

Your Committee finds that the use of the Internet to entice children into meetings has become widespread. Current laws do not specifically address using computers to communicate with minors for purposes of committing crime. This measure would close that loophole, and would allow sex offenders to be investigated and prosecuted before they commit a kidnapping or other crime. One method of investigation that has been successful in arresting sex offenders before a child is hurt has been sting operations in which the sex offender's intended victim is actually a police officer posing as a minor in chat rooms or E-mail communications. Once the sex offender agrees to meet the child and goes to the meeting place, the offender is arrested.

However, the sex offender's defense to attempted sexual assault is often the defense of impossibility because the person posing as a child was not actually a child. Therefore, it is important to criminalize the sex offender's predatory computer behavior, so that the offender can be prosecuted for what the offender has actually done, as opposed to what the offender might have been trying to do.

S. Stand. Comm. Rep. No. 2867, in 2002 Senate Journal, at 1384 (emphasis added). Thus, the introduction of these bills enabled the State to prosecute predatory computer behavior where an individual engaged in online communications with a minor, agreed to meet with that person, and physically traveled to the specified meeting place. *Id. See also* S. Stand. Comm. Rep. No. 3131, in 2002 Senate Journal, at 1498.

The statute that was ultimately enacted, HRS § 707–756, contained three distinct conduct elements: (1) the initial communication with the minor, (2) the agreement to meet with intent to commit a felony, and (3) the act of physically traveling to the agreed-upon place at the agreed-upon time. Viewing the statute in light of the underlying policy which the legislature sought to promulgate, it is apparent that each of these elements served a distinct purpose: requiring that the defendant utilize a computer or electronic device to communicate with a minor addresses the legislature's concern regarding the use of new technologies to target children; requiring that the agreement to meet be made with felonious intent ensures that the defendant has a culpable state of mind at the time he entices the child into meeting; and requiring that the defendant travel to an agreed-upon meeting place at an agreed-upon meeting time ensures that an individual is prosecuted only in situations where his behavior poses an actual physical threat to the child.

### B. Travel to an Agreed–Upon Meeting Place

McKnight argues that the circuit court erred in failing to instruct the jury that the State was required to prove that he used a computer or electronic device to travel to an agreed-upon meeting place at an agreed-

upon meeting time. We disagree and conclude, as the ICA did, that extending the computer-use requirement to the act of traveling would be absurd.

▮ Pursuant to established principles of statutory construction, the court will depart from a literal reading of a statute when the plain language results in an "absurd or unjust result" and is "clearly inconsistent with the purposes and policies of the statute." *State v. Park,* 55 Haw. 610, 614, 525 P.2d 586, 589–90 (1974). *See also Keliipuleole,* 85 Hawai'i at 221–22, 941 P.2d at 304–05 ("[A] rational, sensible and practical interpretation of a statute is preferred to one which is unreasonable or impracticable, because the legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." (citations, internal quotation marks, and brackets omitted)). Even where a statute appears unambiguous, the court may deviate from a literal application of the language in order to avoid absurdity and give effect to the legislature's intended purpose. *State v. Ogata,* 58 Haw. 514, 518, 572 P.2d 1222, 1225 (1977). *See, e.g., State v. Stan's Contracting,* 111 Hawai'i 17, 27–28, 137 P.3d 331, 341–42 (2006) (holding that a narrow interpretation of the word "fraud" in tolling statute would lead to absurd and unjust results); *State v. Haugen,* 104 Hawai'i 71, 76–77, 85 P.3d 178, 183–84 (2004) (holding that, although a statute regarding sentencing for first-time drug offenders was "plain, obvious, and unambiguous" in its terms, construing the statute by its plain language would be inconsistent with, contrary to, and illogical in light of the legislature's intent in enacting the statute).

Although HRS § 707–756 structurally appears to require that a defendant use a computer or other electronic device to travel to an agreed-upon meeting place at an agreed-upon time, a literal reading of this paragraph is absurd. As the State correctly points out, computers are not modes of transportation that can be used to travel to a given location. In order to avoid absurdity, as required by the rules of statutory construction, we hold that the HRS § 707–756 does not require the State to prove that the defendant used a

computer or electronic device to travel to the agreed-upon meeting place.

## C. The Agreement to Meet

McKnight also argues that the circuit court erred in failing to instruct the jury that the State was required to prove that he used a computer or electronic device to agree to meet with a person who represented herself to be under the age of eighteen years.[11] The ICA held that this interpretation of the statute would result in the same absurdity as requiring the use of a computer to travel to a meeting place. We disagree, because it is conceivable to utilize a computer or other electronic device (e.g., cellular phone or PDA) to agree to meet someone. We conclude, however, that extending the computer-use requirement to the agreement to meet is inconsistent with the overall statutory structure of HRS § 707–756.

▬▬▬ In construing each individual part of a statute, the court must consider the statute as a whole to ensure that all parts produce a harmonious and sensible whole.

> It is fundamental in statutory construction that each part or section of a statute should be construed in connection with every other part or section so as to produce a harmonious whole. Statutes should be interpreted according to the intent and meaning, and not always according to the letter, and every part thereof must be viewed in connection with the whole so as to make all parts harmonize, if practicable, and give a sensible and intelligent effect to each.

*Davis*, 63 Haw. at 196, 624 P.2d at 380 (citation omitted).

At the time of McKnight's conviction, HRS § 707–756 (Supp.2006) provided, in relevant part:

> (1) Any person who, using a computer or any other electronic device:
>
> > (a) Intentionally or knowingly communicates:
> >
> > . . .

(iii) With another person who represents that person to be under the age of eighteen years; and

(b) With the intent to promote or facilitate the commission of a felony:

. . .

(iii) That is an offense defined in section 846E–1;

Agrees to meet . . . with another person who represents that person to be a minor under the age of eighteen years; and

(c) Intentionally or knowingly travels to the agreed upon meeting place at the agreed upon meeting time; is guilty of electronic enticement of a child in the first degree.

(Emphasis added).

Upon initial review, it appears the computer-use requirement in subsection (1) applies to (a) the act of communication, (b) the agreement to meet with intent to promote or facilitate a felony, and (c) the act of traveling to the agreed-upon meeting place at the agreed-upon meeting time. For the reasons noted earlier, however, we have already concluded that extending the computer-use requirement to (c) would be absurd. Imposing the computer-use requirement on the first two conduct elements but not the third renders the statute inconsistent in terms of its structure. In order to construe the statute as a harmonious whole, the computer-use requirement can only logically apply to (a), the act of communicating with a person who represents him- or herself to be under the age of eighteen years, and not to (b) or (c).

If the legislature had intended to extend the computer-use requirement to the agreement to meet, it could have structured the second subsection more naturally to read, "(1) Any person who, using a computer or any other electronic device: (a) . . . communicates . . .; and (b) Agrees to meet . . . with another person who represents that person to be a minor under the age of eighteen years, with the intent to promote or facilitate the commission of a felony. . . ." To sensibly

---

**11.** McKnight did not contend on appeal that there was insufficient evidence to prove that he used a computer or electronic device to "agree[ ]

to meet" a person claiming to be a minor; and the State presented evidence that the agreement to meet "Chyla" occurred via online chat.

construe the statute as written, we apply the computer-use requirement only to the act of communicating with the purported minor.[12] We therefore conclude that the circuit court did not err by not instructing the jury that the State was required to prove that McKnight used a computer or electronic device to agree to meet with "Chyla."

Accordingly, we affirm the ICA's Judgment on Appeal to the extent it affirmed McKnight's conviction on Count 1 for Electronic Enticement of a Child in the First Degree.

## PART II: SUPPRESSION OF MCKNIGHT'S STATEMENT WAS PROPER WHERE AGENTS FAILED TO OBTAIN A VOLUNTARY WAIVER OF HIS *MIRANDA* RIGHTS

(By: McKenna, J., with whom Recktenwald, C.J., Nakayama, and Acoba, JJ., and Circuit Judge Trader join).

We hold that McKnight's statement to Agent Domingo was obtained in violation of his constitutional right against self-incrimination, and that the circuit court properly suppressed this statement at trial.[13]

McKnight argues that the circuit court properly suppressed his statement to Agent Domingo because agents failed to obtain a valid waiver of his *Miranda* rights, and that the ICA erred in vacating the court's suppression order. The State contends that McKnight's statement was voluntarily given after McKnight initiated communication with Agent Domingo and waived his right to counsel; in addition, it argues that Agent Domingo's failure to immediately contact an attorney, his intention to further question McKnight, and his denial of McKnight's stat-

utory right to call his mother did not detract from this voluntary waiver of rights.

 This court answers questions of constitutional law by exercising its independent judgment based on the facts of the case and reviewing such questions under the "right/wrong" standard. *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000). We review the trial court's ruling on a motion to suppress de novo "to determine whether the ruling was 'right' or 'wrong.'" *Id.* (citation omitted). Where a defendant claims that a custodial statement was obtained in violation of his right against self-incrimination, this court reviews "the totality of the circumstances surrounding [his] statement" and "make[s] an independent determination of the ultimate issue of voluntariness." *State v. Kelekolio*, 74 Haw. 479, 502, 849 P.2d 58, 69 (1993) (citation omitted). We conclude, in view of the totality of the circumstances, that McKnight did not reinitiate communication with the agents and that his custodial statement was obtained without a voluntary waiver of his *Miranda* rights.

### A. The Right Against Self–Incrimination

 Article I, section 10, of the Hawai'i Constitution and the Fifth Amendment of the United States Constitution both recognize the right against self-incrimination and require the State to show that certain procedural safeguards are taken to advise a criminal defendant of his constitutional rights before custodial statements may be used against him as direct evidence or impeachment evidence. *State v. Ketchum*, 97 Hawai'i 107, 116, 34 P.3d 1006, 1015 (2001). Specifically, a defendant must be advised of his right to remain silent, the fact that anything he says may be used as evidence against him, his right to an attorney, and the fact that an

---

12. We believe this interpretation is also consistent with the legislature's subsequent decision to remove the word "and" between subsections (1)(a) and (1)(b). See HRS § 707–756 (Supp. 2012).

13. In addressing McKnight's motion to suppress, the circuit court found that Agent Domingo had also violated HRS §§ 803–9(2) and (4) by failing to make reasonable efforts to contact an attorney and refusing to allow McKnight to call his mother prior to questioning. It concluded that these statutory violations did not warrant suppression

of McKnight's statement where McKnight failed to show a causal connection between the violations and his statement. The court concluded, however, that McKnight's statement must be suppressed because it was obtained in violation of his right to counsel.

As the ICA correctly noted, McKnight did not dispute the court's ruling that the statutory violations did not warrant suppression of his statement. Accordingly, we do not find it necessary to address this issue.

attorney will be appointed for him if he cannot afford one. *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *accord State v. Nelson*, 69 Haw. 461, 467–68, 748 P.2d 365, 369 (1987).

■ When a defendant makes an unequivocal request for counsel during custodial interrogation, all questioning must cease until counsel is present or until the defendant himself reinitiates further conversation. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) ("[A]n accused, . . ., having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.").

B. <u>Voluntary, Knowing, and Intelligent Waiver of Rights</u>

■ Once a defendant invokes his right to counsel, the police must cease all interrogation. *See Ketchum*, 97 Hawaiʻi at 119–21, 34 P.3d at 1018–20 (explaining that "interrogation" includes any words or conduct "that the officer knows or reasonably

should know is likely to elicit an incriminating response").[14] In order to determine whether a statement constitutes interrogation, the court must objectively assess the totality of the circumstances, including "the conduct of the police, the nature of the questions asked, and any other relevant circumstances[,]" such that the ultimate question becomes "whether the officer should have known that his or her words or actions were reasonably likely to elicit an incriminating response" from the defendant. *Id.* at 119, 34 P.3d at 1018 (citation, internal quotation marks, and brackets omitted). *See State v. Ikaika*, 67 Haw. 563, 567, 698 P.2d 281, 284 (1985) (holding that defendant's inculpatory statements were not the product of interrogation where a detective could not have known his words would elicit an incriminating response).[15]

■ A defendant may open the door to the possibility of further questioning by initiating communication with the police and voluntarily waiving his constitutional rights. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983) (holding that defendant's inquiry as to what was going to happen next "was not merely a necessary inquiry arising out of the incidents

---

**14.** In *Ketchum*, officers executing a search warrant for drug contraband detained the defendant in the master bedroom and asked him about his residential address. 97 Hawaiʻi at 111–14, 34 P.3d at 1010–1013. The officers knew that admissions regarding the defendant's address would assist in prosecuting him for constructive possession of any drug contraband found in the residence. *Id.* at 112–15, 34 P.3d at 1011–14.

Given the circumstances, this court concluded that the defendant's admissions regarding his address were the product of custodial interrogation in violation of his *Miranda* rights. *Id.* at 120–21, 34 P.3d at 1019–20. This court held:

> Accordingly, we reaffirm the principle that interrogation consists of any express question— or, absent an express question, any words or conduct—that the officer knows or reasonably should know is likely to elicit an incriminating response. The totality of the circumstances must be considered to determine whether interrogation has occurred, with a focus on the officer's conduct, the nature of the question (including whether the question is a routine booking question), and any other relevant circumstance.

*Id.* at 121, 34 P.3d at 1020 (citations and internal quotation marks omitted).

**15.** In *Ikaika*, the defendant invoked his right to counsel when he was detained for questioning as a witness in a murder. 67 Haw. at 564–65, 698 P.2d at 283. As he was waiting in the booking area, he approached an officer with whom he was acquainted but who was not familiar with the facts of the case or the charge against him. *Id.* The officer said "What's happening? Must be heavy stuff for two detectives to bring you down here?" *Id.* The defendant responded that he had been picked up for questioning and then confessed to the murder. *Id.* The officer informed the defendant of his *Miranda* rights, but the defendant stated that he did not want an attorney and that he wished to make a statement. *Id.*

This court held that the relevant inquiry was "whether the police officer should have known that his words or actions were reasonably likely to elicit an incriminating response from the [d]efendant." 67 Haw. at 567, 698 P.2d at 284. We concluded that the defendant's inculpatory statements were not the product of interrogation because the officer was unaware of the circumstances of the defendant's detention and did not initiate questioning until the defendant approached him. *Id.* at 567–68, 698 P.2d at 284–85.

of the custodial relationship[,]" and instead, "evinced a willingness and a desire for a generalized discussion about the investigation").

▮▮▮▮ Substantive questioning may continue only if the defendant voluntarily, knowingly, and intelligently waives his *Miranda* rights. *State v. Hoey*, 77 Hawai'i 17, 34–36, 881 P.2d 504, 521–23 (1994) (noting that the protection afforded by the Hawai'i Constitution is broader than that recognized under the U.S. Constitution). To determine whether a defendant has waived his *Miranda* rights, the court must examine the entire record and make an independent determination of the ultimate issue of voluntariness based on the totality of circumstances. *State v. Wallace*, 105 Hawai'i 131, 143–44, 94 P.3d 1275, 1287–88 (2004); *accord State v. Henderson*, 80 Hawai'i 439, 442, 911 P.2d 74, 77 (1996). "The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights." *State v. Maluia*, 56 Haw. 428, 432, 539 P.2d 1200, 1205 (1975) (citation omitted). *See State v. Edwards*, 96 Hawai'i 224, 240, 30 P.3d 238, 254 (2001) (concluding that defendant voluntarily, knowingly, and intelligently waived her *Miranda* rights, despite the fact that officers failed to use reasonable effort to contact her attorney).

▮▮▮ In this case, McKnight unambiguously invoked his right to counsel when he indicated that he did not want to give a statement and wanted an attorney present while being questioned. This invoked the bright-line rule under *Edwards v. Arizona*, 451 U.S. at 484–85, 101 S.Ct. at 1885, and agents were prohibited from further questioning McKnight until an attorney had been provided or McKnight voluntarily reinitiated communication.

Agent Domingo initially ceased questioning McKnight, but he later returned to the room with the intention of further questioning McKnight to obtain information he hoped to use in a warrant application. In the meantime, Agent Domingo did not attempt to contact an attorney on McKnight's behalf, ask McKnight whether he wished to contact an attorney, or provide McKnight an opportunity to call an attorney. When McKnight asked what was going to happen next, Agent Domingo stated that they planned to execute a search warrant on his residence; at the time, agents had not yet obtained a search warrant for McKnight's residence. McKnight then offered to give a statement; however, he again indicated that he wished to speak to his mother. When Agent Domingo responded that he could not promise anything, McKnight finally agreed to continue with a statement. It was only after this confluence of events that McKnight agreed to waive his right to an attorney and give a statement.

The totality of the circumstances establishes that McKnight did not reinitiate contact with Agent Domingo, and his subsequent waiver of *Miranda* rights was not voluntarily give. In addition to failing to make a reasonable effort to contact an attorney, Agent Domingo's conduct and his comment about executing a search warrant on McKnight's residence were reasonably likely to elicit an incriminating response.[16] Accordingly,

16. This court has held that a defendant's statement was the product of interrogation where an officer's comment was reasonably likely to elicit an incriminating response—for example, where a detective asked the defendant if he wanted to give "his side of the story," *State v. Eli*, 126 Hawai'i 510, 523, 273 P.3d 1196, 1209 (2012); where an officer questioned a putative rape victim about discrepancies in her polygraph exam and encouraged her to tell the truth, *State v. Roman*, 70 Haw. 351, 358, 772 P.2d 113, 117 (1989); and where an officer presented the defendant with incriminating evidence in the form of written witnesses' statements and oral explanations of that evidence, *State v. Uganiza*, 68 Haw. 28, 30, 702 P.2d 1352, 1355 (1985).

By comparison, we have held that a statement was not the product of interrogation where an officer requested the defendant's consent to search a nylon bag beneath the driver's seat of a car, *State v. Rippe*, 119 Hawai'i 15, 22–24, 193 P.3d 1215, 1222–24 (App.2008) (holding, however, that a follow-up question concerning defendant's ownership of the car along with statement that the bag was found inside the car did constitute interrogation because this was likely to elicit an incriminating response); or where a sign language interpreter asked a deaf-mute defendant if he wished to make a statement, *State v. Naititi*, 104 Hawai'i 224, 237, 87 P.3d 893, 906 (2004).

McKnight's waiver of the right to counsel was not voluntary, and his statement was obtained in violation of his rights under Article I, section 10 of the Hawai'i constitution.

For the reasons stated above, we vacate the ICA's judgment vacating the circuit court's February 1, 2007 order granting McKnight's motion to suppress his statement as involuntary.

## PART III: THE CIRCUIT COURT ERRED IN SUPPRESSING EVIDENCE OBTAINED PURSUANT TO THE SEARCH WARRANT

### (By: Recktenwald, C.J., with whom Nakayama, J., and Circuit Judge Trader join)

We hold that under the circumstances of this case, the evidence seized pursuant to a search warrant containing a scrivener's error should not be suppressed. Police seized hundreds of files of suspected child pornography pursuant to a search warrant supported by probable cause. The issuing judge misdated the warrant, but the actual date of issuance was never in dispute and the warrant was timely served. Under these circumstances, no constitutional or other violation occurred, and suppression of the evidence would not serve any of the purposes of the exclusionary rule. Accordingly, the circuit court erred in suppressing this evidence.

The Hawai'i Constitution protects against unreasonable searches, seizures, and invasions of privacy. Haw. Const. art. I, section 7 (1978) (providing that "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted"). In addition, a judge must also follow statutory require-ments when issuing a search warrant. *See* HRS §§ 803–31 to –34 (1993). In particular, HRS § 803–34 describes requirements with regard to a warrant's form and content:

> [t]he warrant shall be in writing, signed by the magistrate, with the magistrate's official designation, directed to some sheriff or other officer of justice, and commanding the sheriff or other officer to search for and bring before the magistrate, the property or articles specified in the affidavit, to be disposed of according to justice, and also to bring before the magistrate for examination the person in whose possession the property or articles may be found.

Hawai'i Rules of Penal Procedure (HRPP) Rule 41 (2010) further establishes specific requirements that judges must follow when issuing a search warrant. Specifically, HRPP Rule 41(c) provides, in relevant part, that a warrant "command the officer to search, within a specified period of time not to exceed 10 days, the person or place named for the property specified."

 Viewed against the foregoing authorities, the judge's scrivener's error did not render the warrant invalid. As stated above, in compliance with HRPP Rule 41(c), the search warrant stated that it "may be served and the search made on or before July 16, 2006, a date not to exceed ten (10) days from the issuance of this search warrant[.]" (Emphasis added). Although Judge Polak indicated on the search warrant that she signed it on June 6, 2006, no one disputes that the search warrant was in fact signed and issued on July 6, 2006.[17] Moreover, the affidavit supporting the warrant refutes any notion that the search warrant was signed on June 6, 2006. For example, the affidavit states that "your affiant commenced the actual physical mechanics of preparing this affidavit and attached search warrant at 1330 hours, on July 06, 2006[.]" All of the facts and circumstances cited to establish probable cause occurred after June 6, 2006.[18] It is therefore obvious that the actual issuance

---

17. Agent Domingo also testified at the motion to suppress hearing that he presented the search warrant and affidavits to Judge Polak on July 6, 2006.

18. Accordingly, although Judge Polak wrote on the affidavit that it was presented to her on June 6, 2006, the contents of the affidavit demonstrate that Agent Domingo presented the search warrant and affidavit to her on July 6, 2006.

date could not have been June 6, 2006. It is also undisputed that the search pursuant to the warrant was conducted on July 6, 2006, which was "on or before July 16, 2006, a date not to exceed ten (10) days from the issuance of this search warrant[.]" [19] Finally, the warrant was supported by probable cause.

McKnight does not argue that the search was conducted ten days after the warrant was issued, nor does he argue that the warrant was not supported by probable cause. Rather, he argues that the evidence obtained pursuant to the warrant must be suppressed solely because the judge misdated the warrant.[20] We decline to hold that such a technical error renders the warrant in this case invalid. The above facts, undisputed by the parties and supported by the record, establish the following: the warrant set forth a date by which it had to be served, that date

did not exceed ten days from the warrant's issuance, and the warrant—supported by probable cause—was timely executed. No constitutional or other violation occurred, and it thus cannot be said that the search was illegal. *See* Haw. Const. art. I, section 7 (providing that "no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted"); HRS § 803–34; HRPP Rule 41(c) (requiring a warrant to "command the officer to search, within a specified period of time not to exceed 10 days, the person or place named for the property specified").

Numerous jurisdictions have rejected the contention that scrivener's errors render a search warrant invalid.[21] *See* John M. Bur-

**19.** The dissent states that the ten-day limitation as set forth in HRPP Rule 41(c) "protects against stale warrants[.]" Dissenting opinion at 408, 319 P.3d at 327. We agree. As discussed in this opinion, however, the record clearly shows that the warrant was not stale; that is, that it was executed within 10 days of its issuance. To the extent that the dissent cites *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991)—which did not involve a clerical error regarding a warrant's issuance date but involved an affidavit that lacked requisite facts—we note in that case, the Supreme Court of Pennsylvania expressly declined to adopt the "good faith" exception to the exclusionary rule, emphasizing, inter alia, that its constitution is "unshakably linked to a right of privacy[.]" *Edmunds*, 586 A.2d at 898, 905–06. We also note that Pennsylvania courts have nonetheless repeatedly rejected the argument that a clerical error regarding the time of a warrant's issuance is fatal. *See, e.g., Commonwealth v. Benson*, 10 A.3d 1268, 1271–72, 1274 (Pa.Super.Ct.2010). In *Benson*, a detective served a warrant on a cellular telephone provider on April 28, 2008, when the warrant was issued. *Id.* at 1271–72. The district judge correctly dated the section of the warrant document that indicates the date the warrant application was sworn to, but incorrectly dated the issuing section of the warrant application as April 29, 2008. *Id.* The Pennsylvania Superior Court stated that even if the defendant had a legitimate expectation of privacy in the seized telephone records, the clerical error did not invalidate the warrant, because "Pennsylvania Courts have long held that a technical defect in a warrant, such as the mis-dating at issue here, does not render a warrant invalid in the absence of a showing of prejudice." *Id.* at 1274 (citing *Commonwealth v. Hamlin*, 503 Pa. 210, 469 A.2d 137,

140 (1983) and *Commonwealth v. Begley*, 566 Pa. 239, 780 A.2d 605, 641 (2001)).

**20.** McKnight argues that "[c]ompliance was impossible" because the warrant limited the search to a date not to exceed ten days from the issuance, and the date of the issuance on the face of the warrant read "June 6, 2006." However, the warrant expressly specified that July 16, 2006 was the "date not to exceed ten (10) days from the issuance[.]" Thus, compliance with the terms of the warrant, which was actually issued on July 6, 2006, was possible; and, under the undisputed facts of the case, compliance did occur.

**21.** For example, the Ninth Circuit Court of Appeals rejected the argument that a judge's misdating of a search warrant rendered the warrant invalid. *See United States v. Hitchcock*, 286 F.3d 1064, 1072 (9th Cir.2002). In *Hitchcock*, an agent obtained and executed a search warrant on November 16, 1998. *Id.* at 1071. The agent left a copy of the warrant, dated November 17, 1998, with the defendant's mother. *Id.* At the outset, the Ninth Circuit rejected the application of the good faith exception, stating: "As we have described it, the good faith exception to the exclusionary rule permits law enforcement officers reasonably to rely on search warrants that are later determined to be invalid[.]" *Id.* The Ninth Circuit further stated that "[t]he good faith exception has no application here, where there is no dispute about the search warrant's validity but only about whether the agents executed the warrant before it was effective." *Id.* The Ninth Circuit noted that the defendant did not dispute that although the warrant was dated November 17, 1998, the judge signed and issued the warrant on November 16, 1998. *Id.* at 1072. The

koff, *Search Warrant Law Deskbook* § 10:2 & § 10.2 n. 10 (2013) (listing state and federal cases supporting the proposition that a "clerical error on the face of the warrant misstating or omitting the date or time of issuance is generally held not to be controlling as to the <u>actual</u> date or time of issuance of the warrant"). For example, in *State v. Dalton*, 132 Or.App. 36, 887 P.2d 379 (1994), a police officer presented a magistrate with an affidavit dated November 9, 1993, but the magistrate issued a warrant dated October 9, 1993. 887 P.2d at 379–80. The warrant was executed the day after its issuance, on November 10, 1993. *Id.* at 380. The Oregon Court of Appeals held that the inadvertent misdating of the warrant was "simply a scrivener's error" that "did not frustrate the constitutional objective served by the statutory requirement that search warrants be dated and executed within five days of their issuance." *Id.* In a subsequent case, the Oregon Court of Appeals held that the lack of a year on a warrant's issuance date was a mere scrivener's error that did not require suppression, noting:

> There is no explicit constitutional requirement for a particularized date or, for that matter, for any date at all; rather, the constitution requires only that the warrant be based "upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

*State v. Radford*, 223 Or.App. 406, 196 P.3d 23, 26 (2008); *see also Heard v. State*, 272 Ark. 140, 612 S.W.2d 312 (1981) (upholding the validity of a search warrant which was dated 1978 on the top of the document but dated 1976 above the issuing judge's signature where evidence showed that 1978 was the correct year and the discrepancy was an obvious clerical typographical error).[22]

Jurisdictions that have refused to invalidate search warrants because of a scrivener's error also include states with constitutions that, like ours, recognize the right against unreasonable invasions of privacy as part of their constitutional search and seizure provisions. For example, the Supreme Court of South Carolina expressly refused to find that the misdating of a search warrant rendered it invalid. *State v. Shupper*, 263 S.C. 53, 207 S.E.2d 799, 800–01 (1974) (cited with approval in *State v. Herring*, 387 S.C. 201, 692 S.E.2d 490, 496 (2009)); S.C. Const. art. 1, § 10.[23] In *Shupper*, the date typed on the search warrant was January 5, 1972, and the search was made on January 5, 1973. 207 S.E.2d at 800. The defendant claimed that the warrant violated a statute that required "execution and return 'within ten days after (the warrant) is dated[.]'" *Id.* The Supreme

---

Ninth Circuit also noted that the judge corrected the return copy of the warrant to read "November 16, 1998," and that there was no evidence indicating that the judge intended to postdate the warrant. *Id.* Ultimately, the Ninth Circuit concluded that "where an agent obtains a search warrant from the court and later that day conducts an otherwise valid search, the search is within the scope of the warrant, notwithstanding the fact that the warrant is post-dated by one day, so long as the evidence in the record indicates that the only reason the search warrant was post-dated was the court's inadvertence." *Id.*

**22.** The dissent argues that the aforementioned Oregon and Arkansas cases are "inapposite" because the constitutions of those states do not contain the same language regarding the right to privacy that appears in our state constitution; namely, the right to be secure in one's "persons, houses, papers and effects against unreasonable searches, seizures <u>and invasions of privacy</u>[.]" Dissenting opinion at 407, 319 P.3d at 326 (citing Haw. Const. art. I § 7 (emphasis in dissenting opinion)). Respectfully, this distinction is

not dispositive to the issue here, which is whether a scrivener's error in the warrant alone renders the resulting search, seizure and invasion of privacy unreasonable. In other words, the issue here does not turn on whether the constitution explicitly protects against invasions of privacy; rather, the question is whether an invasion (and search or seizure) is <u>unreasonable.</u> In any event, as discussed infra, jurisdictions with express privacy protections in their constitutions have also similarly rejected the argument that scrivener's errors alone justify invalidating a warrant.

**23.** Article 1, section 10 of the South Carolina Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and <u>unreasonable invasions of privacy</u> shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, the person or thing to be seized, and the information to be obtained.
> (Emphasis added).

Court of South Carolina rejected that argument, stating that the incorrect date "was a mere typographical error not affecting [t]he validity of the search which actually occurred within an hour or two of the issuance of the warrant." *Id.*

In another jurisdiction with a constitutional privacy provision similar to Hawaii's, the Court of Appeal of Louisiana held that a search warrant erroneously dated five months prior to its actual issuance date was not invalid. *State v. E.J.F.,* 999 So.2d 224, 231–32 (La.Ct.App.2008); La. Const. art. 1, § 5.[24] In that case, the search warrant was originally dated July 21, 2005, and was corrected by the issuing judge, following the search, to read December 21, 2005. *E.J.F.,* 999 So.2d at 231. Relying on a Louisiana Code of Criminal Procedure provision prohibiting the execution of a search warrant "after the expiration of the tenth day after its issuance[,]" the defendant argued that the evidence seized pursuant to the search warrant should have been suppressed "on the grounds of the warrant being stale, as December 21 is obviously more than ten days past July 21." *Id.* at 231–32, 231 n. 4. The issuing judge, who also presided over the defendant's trial and denied the defendant's motion to suppress, took judicial notice of his handwriting on the search warrant where the corrections to the date were made. *Id.* at 231–32. On appeal, the *E.J.F.* court held that the warrant had not expired, noting that testimony clearly indicated that the application for the search warrant was presented to the judge on December 21, 2005, and that the investigation did not begin until December 19, 2005. *Id.* at 233. The court further stated that "[t]o suggest that the warrant

was stale simply ignores the possibility of typographical error, particularly when the judge took judicial notice of his signature next to the correction and the defendant presented no evidence to establish that the warrant was actually prepared on July 21, 2005." *Id.*

Similarly, the Appellate Court of Illinois upheld the validity of a warrant, which erroneously indicated an issuance time that was about ten hours after the search was actually conducted.[25] *People v. Deveaux,* 204 Ill. App.3d 392, 149 Ill.Dec. 563, 561 N.E.2d 1259, 1263–64 (1990). The *Deveaux* court noted that although there is a presumption that the time indicated on a search warrant controls its validity, "extrinsic evidence is permitted to show and correct an obvious clerical error." *Id.,* 149 Ill.Dec. 563, 561 N.E.2d at 1264 (citation omitted). The *Deveaux* court also noted statutory language prohibiting the quashing of warrants " 'because of technical irregularities' " that do not affect the defendant's substantial rights. *Id.* Based on the officer's "uncontroverted testimony" showing that he was in possession of the warrant at the time of the search, the *Deveaux* court held that "the time of issuance was a technical irregularity which did not affect defendant's substantial rights." *Id.* The court explained that the defendant's constitutional rights were not violated or disturbed where, inter alia, the officer's complaint for a search warrant was supported by an affidavit describing the place to be searched and the person and things to be seized, the defendant made no claim that the warrant lacked probable cause, and the officer executed the search after obtaining the warrant.[26] *Id.*

**24.** Article 1, section 5 of the Louisiana Constitution provides:

> Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or <u>invasions of privacy.</u> No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.

(Emphasis added).

**25.** Article 1, section 6 of the Illinois Constitution provides:

> The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, <u>invasions of privacy</u> or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized.

(Emphasis added).

Finally, in Montana, which has a stand-alone constitutional provision recognizing the right to individual privacy,[27] the misdating of a search warrant will not necessarily render the warrant invalid. *See State v. Steffes,* 269 Mont. 214, 887 P.2d 1196, 1210 (1994) (holding that, where the search warrant was misdated June 19, 1991 and was executed on June 18, 1991, the misdating "was merely technical, and did not affect the substantial rights of the defendant").[28]

In sum, the clerical error in the instant case did not render the search warrant invalid.

Moreover, suppressing the evidence would not further any of the purposes of Hawaii's exclusionary rule. This court has recognized three purposes underlying Hawaii's exclusionary rule: (1) judicial integrity, (2) the protection of individual privacy, and (3) deterrence of illegal police misconduct. *State v. Torres,* 125 Hawai'i 382, 394, 262 P.3d 1006, 1018 (2011). As stated above, the only basis to suppress the evidence obtained pursuant to the search warrant in this case would be the issuing judge's clerical error. In light of the facts in the instant case, suppressing the evidence because of a scrivener's error does not serve any of the purposes of the exclusionary rule.

 First, suppressing the evidence would not enhance judicial integrity. "The 'judicial integrity' purpose of the exclusionary rule is essentially that the courts should not place their imprimatur on evidence that was illegally obtained by allowing it to be admitted into evidence in a criminal prosecution." *Torres,* 125 Hawai'i at 394, 262 P.3d at 1018 (citation omitted). Thus, "when evidence is not obtained illegally, no loss of judicial integrity is implicated in a decision to admit the evidence." *State v. Bridges,* 83 Hawai'i 187, 196, 925 P.2d 357, 366 (1996) (citation and quotation marks omitted), *overruled on other grounds by Torres,* 125 Hawai'i 382, 262 P.3d 1006.

Here, there is no harm to judicial integrity in admitting the seized evidence at issue because, as discussed supra, the mere scriv-

---

**26.** The dissent argues that the foregoing South Carolina, Louisiana, and Illinois cases are not germane to the instant case because those states recognize a general "good faith" exception to the warrant requirement. Dissenting opinion at 418, 319 P.3d at 337. Respectfully, however, none of the above cases relied on a "good faith" exception in determining that a mere clerical error alone does not invalidate a warrant. Moreover, the cases cited by the dissent with regard to the "good faith" exception, see dissenting opinion at 418, 319 P.3d at 337, are factually distinguishable from the instant case and involve the application of a good faith exception analysis only after determining that the warrant was invalid. *See State v. Covert,* 368 S.C. 188, 628 S.E.2d 482, 486–87 (S.C.Ct.App.2006), aff'd, 382 S.C. 205, 675 S.E.2d 740 (2009) (conducting a good faith exception analysis after finding that a warrant was defective because the magistrate's signature was dated two days after the search, and "there was no evidence that the magistrate signed the warrant before the search" (emphasis added)); *State v. Maxwell,* 38 So.3d 1086, 1091 (La.Ct.App.2010) (holding that a warrant lacking a description of items to be seized was not facially invalid, and finding, in the alternative, that "even if the warrant were found to be deficient," the seized evidence was admissible under the good faith exception); *People v. Turnage,* 162 Ill.2d 299, 205 Ill.Dec. 118, 642 N.E.2d 1235, 1238–39 (1994) (applying a good faith exception analysis after determining that a "repetitive" ar-

rest warrant issued after the defendant was arrested on identical charges and released on bond was invalid).

**27.** Article II, section 10 of the Montana Constitution provides: "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."

**28.** The dissent appears to distinguish *Steffes* by noting that the *Steffes* court's upholding of the search warrant was based on a Montana statute that precluded searches and seizures from being rendered illegal by "irregularities in the proceedings [that] do not affect the substantial rights of the accused." Dissenting opinion at 418, 319 P.3d at 337 (quotation marks and citations omitted). Respectfully, this distinction is not dispositive. First, statutes cannot override the protections provided by constitutional provisions. *See, e.g., Becky v. Butte–Silver Bow Sch. Dist. No. 1,* 274 Mont. 131, 906 P.2d 193, 196 (1995) (stating that "the Montana Constitution is the supreme law of the state and preempts contrary statutes or rules"). Moreover, *Steffes* remains instructive for its holding that the misdating of a warrant alone, where the actual date of issuance has been determined, is a mere technical error that does not violate a defendant's substantial rights. Here, as stated above, the clerical error at issue in the instant case did not prejudice McKnight or otherwise violate his substantial rights.

ener's error in the issuance date did not result in an unreasonable invasion of McKnight's privacy. As stated above, the search warrant was supported by probable cause, and the search was executed within ten days of the issuance of the warrant. Accordingly, admitting the seized evidence, under these circumstances, in no way compromises judicial integrity.

Second, suppressing the evidence would not serve to protect individual privacy rights. The "primary purpose of both the Fourth Amendment and article I, section 7 [of the Hawaiʻi Constitution] is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *State v. Lopez*, 78 Hawaiʻi 433, 441, 896 P.2d 889, 897 (1995) (citation and quotation marks omitted). Here, the search of McKnight's residence was not "arbitrary" because government agents had established a legitimate basis for the search on July 6, 2006, when the search warrant was executed. The warrant was supported by probable cause, and the search was executed on the same day that the search warrant was issued, in compliance with HRPP Rule 41. The existence of the scrivener's error in no way altered these facts, and the search would not have been conducted in a different manner or time had the court written the correct issuance date on the jurat. In other words, the mere scrivener's error caused no greater invasion of McKnight's privacy than would have occurred had the court written the correct issuance date on the jurat. As the ICA stated, "suppression of the search warrant evidence under the circumstances of this case would only serve to benefit those who were validly subject to search, but by pure fortuity happened to draw an issuing judge who made a clerical error in signing the warrant." *McKnight*, 128 Hawaiʻi at 341–42, 289 P.3d at 977–78. Accordingly, suppressing the evidence at issue would not serve to protect the

privacy purpose underlying the exclusionary rule.

Finally, suppression would not advance the principle of deterring illegal police conduct. As stated above, Agent Domingo properly presented a search warrant supported by probable cause to the district court, the search warrant limited the search to no later than July 16, 2006, a date not exceeding 10 days after July 6, 2006, when the warrant was issued, and the resulting search occurred that day. The only issue here is a clerical error made by the court. Simply stated, no illegal police conduct occurred. Accordingly, suppression of the evidence obtained as a result of the search warrant would not serve to deter law enforcement misconduct.

█ In sum, the clerical error by the issuing judge did not render the search warrant invalid, and suppressing evidence seized pursuant to the warrant would not further the purposes of the exclusionary rule where, as in this case, the warrant was supported by probable cause, the evidence demonstrates the actual date of issuance, and the warrant was executed within the time frame specified in HRPP Rule 41.[29] Therefore, the evidence obtained pursuant to the warrant should not have been suppressed.

Accordingly, we affirm the ICA's judgment to the extent that it vacates the circuit court's suppression order as to the evidence obtained pursuant to the search warrant, and remand the case for further proceedings consistent with this opinion.

Concurring and Dissenting Opinion to Part I by RECKTENWALD, C.J., in which Circuit Judge TRADER joins.

I respectfully dissent from the majority's conclusion that a conviction for Electronic Enticement of a Child in the First Degree does not require the State to prove that the defendant used a computer or electronic device to agree to meet a purported minor.[1]

---

**29.** For all of these reasons, we overrule *State v. Endo*, 83 Hawaiʻi 87, 924 P.2d 581 (App.1996). To the extent that the *Endo* court held that the privacy protections under the Hawaiʻi Constitution prohibit searches under circumstances such as in the instant case, we respectfully disagree. The constitution's explicit protections against unreasonable invasions of privacy cannot be said to

be violated by a technical scrivener's error where, as here, the search warrant was supported by probable cause and it is undisputed that it was timely executed.

**1.** However, as stated *infra*, I concur in the majority's conclusion that the Electronic Enticement of a Child statute does not require a defen-

The majority holds that HRS § 707–756 does not require proof that the defendant used a computer or other electronic device to (1) agree to meet with the minor, or (2) travel to the meeting place. Majority opinion at 387, 389–91, 319 P.3d at 306, 308–10. I concur with the latter conclusion, since it would be absurd to interpret the statute as requiring a defendant to use a computer or electronic device to travel to the meeting place. However, I respectfully disagree with the former conclusion, since requiring that the agreement be made by computer or other electronic device is neither absurd, nor contrary to the legislature's purpose in enacting the statute. Accordingly, I respectfully dissent from that portion of the majority's analysis. I would instead hold that the circuit court erred in failing to instruct the jury that the State was required to prove that McKnight used a computer in agreeing to meet with Chyla.

"[T]he fundamental starting point for statutory-interpretation is the language of the statute itself." *First Ins. Co. of Haw. v. A & B Props.*, 126 Hawai'i 406, 414, 271 P.3d 1165, 1173 (2012). At the time of the incident at issue here, HRS § 707–756(1) (Supp. 2006) provided, in relevant part:

Electronic enticement of a child in the first degree.

 (1) Any person who, using a computer or any other electronic device:

 (a) Intentionally or knowingly communicates:

 (i) With a minor known by the person to be under the age of eighteen years;

 (ii) With another person, in reckless disregard of the risk that the other person is under the age of eighteen years, and the other person is under the age of eighteen years; or

 (iii) With another person who represents that person to be under the age of eighteen years; and

 (b) With the intent to promote or facilitate the commission of a felony:

 (i) That is a murder in the first or second degree;

 (ii) That is a class A felony; or

 (iii) That is an offense defined in section 846E–1;

 agrees to meet with the minor, or with another person who represents that person to be a minor under the age of eighteen years; and

 (c) Intentionally or knowingly travels to the agreed upon meeting place at the agreed upon meeting time;

is guilty of electronic enticement of a child in the first degree.

Thus, the statute requires the State to prove that the defendant, "using a computer or any other electronic device," did three things: (1) intentionally or knowingly communicated with a minor or purported minor, (2) agreed to meet with that minor or purported minor with the intent of promoting or facilitating the commission of certain felonies, and (3) intentionally or knowingly traveled to the agreed upon meeting place. As the majority acknowledges, given the placement of "a computer or any other electronic device" requirement in the introductory sentence of the statute, it appears that the requirement applies to all three actions subsequently identified in subsections (a) to (c). Majority opinion at 389, 319 P.3d at 308. That analysis of the plain language of the statute, absent more, should be the end of our inquiry. *See, e.g., State v. Yamada*, 99 Hawai'i 542, 553, 57 P.3d 467, 478 (2002) ("[I]nasmuch as the statute's language is plain, clear, and unambiguous, our inquiry regarding its interpretation should be at an end.").

However, it is well-settled that "departure from a literal construction of a statute 'is justified when such construction would produce an absurd ... result and the literal construction in the particular action is clearly inconsistent with the purposes and policies of the act.'" *Estate of Roxas v. Marcos*, 121 Hawai'i 59, 67, 214 P.3d 598, 606 (2009) (citations omitted); *Morgan v. Planning Dep't,*

dant to use a computer or electronic device to travel to an agreed-upon meeting place. Majori-

ty opinion at 389, 319 P.3d at 308.

104 Hawai'i 173, 185, 86 P.3d 982, 994 (2004) (same). In the case of subsection (c), the literal application of the language leads to an absurd result: one cannot literally use a computer to physically travel anywhere.[2] Accordingly, since the application of the "computer or any other electronic device" requirement to subsection (c) would lead to an absurd result, *see Morgan,* 104 Hawai'i at 185, 86 P.3d at 994, I agree with the majority that the circuit court did not err in failing to instruct the jury on that issue.

However, as the majority notes, there is nothing absurd about applying that requirement to subsection (b) of the statute, i.e., requiring the State to prove that the defendant used a computer or other electronic device when agreeing to meet with the minor or purported minor, since it is quite possible to use a computer in that manner. *See* majority opinion at 389, 319 P.3d at 308. Nevertheless, the majority further concludes that applying the requirement would be "inconsistent with the overall statutory structure of HRS § 707–756." Majority opinion at 390, 319 P.3d at 309.

I respectfully disagree with that conclusion. There is nothing incoherent about requiring the State to prove that a computer or other electronic device was used to reach the agreement to meet. To the contrary, imposing that requirement is consistent with the legislature's understanding of the purpose of the statute as reflected in the title of section 707–756, which is "Electronic enticement of a child in the first degree." (Emphasis added). *Cf. Moyle v. Y & Y Hyup Shin, Corp.,* 118 Hawai'i 385, 412, 191 P.3d 1062, 1089 (2008) (Acoba, J., concurring) ("As to the purpose of the [Uniform Contribution Among Tortfeasors Act], which is also pertinent to the construction of its language, the title of the statute—the Uniform Contribution Among Tortfeasors Act—clearly indicates to whom it is applicable." (internal citation omitted)); *see also Almendarez–Torres v. United States,* 523 U.S. 224, 234, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (stating that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute" (citations and quotation marks omitted)).

As the title of section 707–756 indicates, the legislature intended that the "enticement" be undertaken by "electronic" means. It is therefore consistent with that intent to require that a computer or other electronic device be used to accomplish the actions described in subsection (b). Indeed, those actions (an agreement to meet with a minor or purported minor with the intent to promote or facilitate the commission of various felonies) closely track the common understanding of "enticement," which is "[t]he act or an instance of wrongfully soliciting or luring a person to do something." *Black's Law Dictionary* 611 (9th ed. 2009); *see also* id. at 612 (defining "enticement of a child" as "[t]he act or offense of inviting, persuading, or attempting to persuade a child to enter a vehicle, building, room, or secluded place with the intent of committing an unlawful sexual act against the child").

By contrast, under the majority's approach, the State only would need to show that the defendant used a computer or other electronic device to "communicate" with the minor or purported minor at some point. Respectfully, that interpretation casts a much wider net of culpability than the legislature intended when it criminalized "[e]lectronic enticement" in section 707–756. Under the majority's interpretation, a defendant (for example, a sports coach or music instructor) who communicates with a minor online with no criminal intent, and who then interacts with that child in person for years before finally developing an unlawful intent and agreeing in person to meet the child to further that intent, could be guilty of violating section 707–756. While such a person's actions would be deplorable, they would not appear to constitute the "electronic enticement" that the legislature sought to criminalize in <u>this</u> statute.

---

2. Although McKnight argues that we should read the statute as simply requiring that a computer be used in some way to facilitate the travel (such as to purchase tickets online), that is not how the statute is drafted; rather, it requires that the defendant "use[ ]" a computer or other electronic device to travel to the meeting place.

The majority cites to the legislative history in support of its interpretation of the statute; indeed, the majority begins its analysis by attempting to determine the statute's purpose in light of its legislative history. Majority opinion at 387–89, 319 P.3d at 306–08. Respectfully, I disagree with the majority's approach. Although it is true that this court has, on occasion, appeared to suggest that legislative history can be used to overcome the plain language of a statute, *see State v. Wells,* 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995) ("[I]n determining the purpose of the statute, we are not limited to the words of the statute to discern the underlying policy which the legislature seeks to promulgate but may look to relevant legislative history." (quotation marks, ellipses, brackets and citation omitted)), the weight of our decisions recognizes that the starting point of our analysis should be the plain language, and that the analysis ends there unless the language is ambiguous or certain other circumstances (such as the application of the plain language resulting in an absurdity) exist. *See, e.g., Yamada,* 99 Hawai'i at 553, 57 P.3d at 478; *State v. Richie,* 88 Hawai'i 19, 30, 960 P.2d 1227, 1238 (1998) ("It is a cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning."); *State v. Smith,* 103 Hawai'i 228, 234, 81 P.3d 408, 414 (2003) (noting that "our sole duty is to give effect to the statute's plain and obvious meaning") (citation and quotation marks omitted); *State v. Dudoit,* 90 Hawai'i 262, 271, 978 P.2d 700, 709 (1999) ("Even where the Court is convinced in its own mind that the Legislature really meant and intended something not expressed by the phraseology of the Act, it has no authority to depart from the plain meaning of the language used."). Respectfully, no such circumstances exist here. The application of the computer or other electronic device requirement to subsection (b) of the statute does not result in an absurdity, and is consistent with the purpose of the statute as reflected in the section's title.

However, even assuming for purposes of argument that the statute is somehow ambiguous and that resort to the legislative history is therefore appropriate, that history nonetheless supports the understanding of the purpose of the section that is reflected in its title, "Electronic enticement." When the legislature enacted section 707–756 in 2002, the House Judiciary and Hawaiian Affairs committee stated that the purpose of the legislation was to deter crimes against minors by, inter alia, "[c]reating two new offenses of first and second degree electronic enticement of a child, which prohibit the <u>use of a computer or other electronic device to lure a minor to a meeting with intent to commit a felony</u>[.]" H. Stand. Comm. Rep. No. 417, in 2002 House Journal, at 1399 (emphasis added). Similarly, the Senate Judiciary Committee noted that "the <u>use of the Internet to entice children into meetings</u> has become widespread and current laws do not specifically address <u>using computers to communicate with minors for purposes of committing crimes</u>." S. Stand. Comm. Rep. No. 3131, in 2002 Senate Journal, at 1498 (emphases added). The Senate Health and Human Services Committee further stated the following with regard to the electronic enticement legislation:

> This measure would close that loophole, and would allow sex offenders to be investigated and prosecuted before they commit a kidnapping or other crime. One method of investigation that has been successful in arresting sex offenders before a child is hurt has been sting operations in which the sex offender's intended victim is actually a police officer posing as a minor in chat rooms or E-mail communications. Once the sex offender agrees to meet the child and goes to the meeting place, the offender is arrested. However, the sex offender's defense to attempted sexual assault is often the defense of impossibility because the person posing as a child was not actually a child. Therefore, <u>it is important to criminalize the sex offender's predatory computer behavior</u>, so that the offender can be prosecuted for what the offender has actually done, as opposed to what the offender may have been trying to do.

S. Stand. Comm. Rep. No. 2867, in 2002 Senate Journal, at 1384 (emphasis added).

In sum, the legislative history clearly establishes that the legislature intended to criminalize "predatory computer behavior" involving "lur[ing]" or "entic[ing]" minors to meet for unlawful purposes. However, under the majority's interpretation, a defendant could be convicted even if his or her use of the computer was completely innocent. Thus, the legislative history does not support the majority's reading of the statute nor the circuit court's jury instructions with regard to the agreement to meet element.

For all these reasons, I conclude that the circuit court plainly erred in failing to instruct the jury that the State was required to prove that McKnight used a computer or other electronic device to agree to meet with Chyla for illicit purposes.

"[O]nce instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt." *State v. Nichols,* 111 Hawai'i 327, 337, 141 P.3d 974, 984 (2006).

Here, the State did not argue that any error in this respect was harmless, and it does not readily appear from the record that McKnight only used electronic devices to agree to meet with Chyla. Accordingly, it would appear that the erroneous jury instruction was not harmless beyond a reasonable doubt. Therefore, I would vacate McKnight's conviction.

**Dissent to Part III: Regarding the Search Warrant, by ACOBA, J., with whom McKENNA, J., joins.**

Ours is a long legal history and tradition of protecting the privacy rights of all persons within the State's territorial boundaries. This fundamental pillar of our State bill of rights can only endure if the judiciary remains faithful to holding inviolate individual protections under the Hawai'i Constitution. Although not labeled as such, the decisions by the majority on the warrant issue herein (Opinion of the Court with respect to Part III, by Recktenwald, C.J.) (hereinafter "majority opinion") and the Intermediate Court of Appeals (ICA) are an embracement of the so-called "good faith" rule, applicable in federal courts, see discussion *infra.* That rule is inimical to the privacy protections under the Hawai'i Constitution, and up to this point has been rejected by this court. Respectfully, the majority's and the ICA's decisions will, as in the federal courts, render the right of privacy inhering in the right against unreasonable searches and seizures and as an independent right, an empty guarantee.

The underlying premise of the majority's opinion and its abrogation of *State v. Endo,* 83 Hawai'i 87, 924 P.2d 581 (App.1996), and the ICA decision reflect an adoption of contrary federal precedent under the federal constitution. Hence, the majority's opinion and the ICA opinion conflict with the Hawai'i Constitution and Hawai'i case law that was most recently reaffirmed in *State v. Torres,* 125 Hawai'i 382, 396, 262 P.3d 1006, 1020 (2011).[1]

I.

In its early decisions, the United States Supreme Court held that the Fourth Amendment "forever secure[d] the people, their persons, houses, papers and effects, against all unreasonable searches and seizures under the guise of law." [2] *Mapp v. Ohio,* 367 U.S. 643, 647, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (citing *Weeks v. United States,* 232 U.S. 383, 391–92, 34 S.Ct. 341, 58 L.Ed. 652 (1914)).[3]

---

1. Significantly, *Torres* was decided before the ICA's opinion in *State v. McKnight,* 128 Hawai'i 328, 289 P.3d 964 (App.2012), was issued, yet was not cited by the ICA.

2. The Fourth Amendment to the United States Constitution states:

 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but

 upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

 U.S. Const. amend. IV.

3. The Supreme Court had held that "[i]f letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure

The Court declared that the use of improperly seized evidence involved a "denial of the constitutional rights of the accused[,]" *id.* (citing *Weeks,* 232 U.S. at 398, 34 S.Ct. 341), and thus "[c]onviction by means of unlawful seizures ... should find no sanction in the judgments of courts." *Id.* at 648, 81 S.Ct. 1684. Evidence acquired by means of unlawful searches and seizures could "not be used at all." *Id.* (citing *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920)).

The exclusionary rule stands for the proposition that in a "prosecution, the Fourth Amendment bars the use of evidence secured through an illegal search and seizure." *Mapp,* 367 U.S. at 647, 81 S.Ct. 1684 (citing *Wolf v. Colorado,* 338 U.S. 25, 28, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949)). In *Mapp,* the Court applied the exclusionary rule to the states. *Id.* at 660, 81 S.Ct. 1684. The Court acknowledged that in some cases "under the exclusionary doctrine 'the criminal is to go free because the constable has blundered.'" *Id.* at 649, 81 S.Ct. 1684 (internal citations omitted) (quoting *People v. Defore,* 242 N.Y. 13, 150 N.E. 585, 587 (1926)). However, the "imperative of judicial integrity" was more important—the "criminal [may go] free if he must, but it is the law that sets him free." *Mapp,* 367 U.S. at 659, 81 S.Ct. 1684 (citing *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)). For nothing is apt to "destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." *Id. Mapp* identified three purposes served by the exclusionary rule: protection of individual privacy rights guaranteed under the Fourth Amendment, the preservation of judicial integrity and deterrence of police misconduct. *Id.* at 659–60, 81 S.Ct. 1684.

Two decades later, in a substantial shift from *Mapp,* the Court in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), abandoned two of the three purposes of the exclusionary rule and decided that the sole purpose of the exclusionary rule was to deter unlawful police conduct.[4] In *Leon,* police officers executed a facially valid warrant issued by a state superior court judge. 468 U.S. at 902, 104 S.Ct. 3430. A federal district court concluded, however, that the warrant was not supported by probable cause and thus that the judge had erred in issuing it. *Id.* at 904, 104 S.Ct. 3430. The Ninth Circuit Court of Appeals affirmed. *Id.*

On review, the Court assumed that the warrant was unsupported by probable cause, but instead of concluding that suppression was the proper remedy under existing precedent, the Court held that the police execution of a warrant was objectively reasonable. *Id.* at 926, 104 S.Ct. 3430. Thus, according to the Court the exclusionary rule did not bar the use of evidence obtained by the police officers acting in good-faith reliance upon a search warrant even if "ultimately [ ] found to be defective." *Id.* at 907, 104 S.Ct. 3430 (emphasis added). In a reversal of its position in *Mapp,* the Court indicated that the exclusionary rule did not apply because (1) it was designed to deter police misconduct rather than to punish the errors of judges and magistrates; (2) judges and magistrates were not inclined to ignore the Fourth Amendment; and (3) there was no reason to believe that excluding evidence seized pursuant to a warrant would have a significant deterrent effect on the issuing judge or magistrate. *Id.* at 906–14, 104 S.Ct. 3430. *Leon* thus created a so called "good-faith" exception to the enforcement against unreasonable

against such searches and seizures is of no value, and ... might as well be stricken from the Constitution." *Mapp,* 367 U.S. at 647, 81 S.Ct. 1684 (citing *Weeks,* 232 U.S. at 393, 34 S.Ct. 341).

4. *Leon* stated that "[t]he deterrent purpose of the exclusionary rule necessarily assumes that the police least negligent, conduct, which has refusing to admit evidence gained as to instill in those particular investigating officers, or in their the very right. By courts hope future counterparts, a greater degree of care toward the rights of an accused." 468 U.S. at 919, 104 S.Ct. 3430 (citing *Michigan v. Tucker,* 417 U.S. 433, 447, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). *See also United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) ("[T]he primary purpose of the exclusionary rule is to deter future unlawful police conduct"); *United States v. Peltier,* 422 U.S. 531, 542, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975) ("[T]he purpose of the exclusionary rule is to deter unlawful police conduct ...").

searches and seizures afforded by the exclusionary rule. *Id.* at 921–22, 104 S.Ct. 3405.

Justice Brennan, joined by Justice Marshall, wrote in dissent that "[t]he judiciary is responsible, no less than the executive, for ensuring that constitutional rights are respected." *Id.* at 932, 104 S.Ct. 3405 (Brennan, J. dissenting, joined by Marshall, J.). By admitting unlawfully seized evidence at trial, the judiciary becomes part of a single governmental action prohibited by the Fourth Amendment. *Id.* at 933, 104 S.Ct. 3405. As Justice Brennan argued, it would be difficult to give any meaning to the limitations imposed by the Amendment if they are read to proscribe only certain conduct by the police "but to allow other agents of the same government to take advantage of evidence secured by the police in violation of its requirements." *Id.* at 934, 104 S.Ct. 3405. According to the dissent, " '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures' comprises a <u>personal right</u> to exclude all evidence secured by means of unreasonable searches and seizures." *Id.* at 935, 104 S.Ct. 3405 (emphasis added). Concluding, the dissent stated that

> the relaxation of Fourth Amendment standards seems a tempting, costless means of meeting the public's demand for better law enforcement. <u>In the long run, however, we as a society pay a heavy price for such expediency, because as Justice Jackson observed, the rights guaranteed in the Fourth Amendment</u> "are not mere second-class rights but belong in the catalog of indispensable freedoms." *Brinegar v. United States,* 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879 (1949) (dissenting opinion). <u>Once lost, such rights are difficult to recover.</u>

*Id.* at 959–60, 104 S.Ct. 3405 (emphases added).

In his dissent, Justice Stevens wrote that "[c]ourts simply cannot escape their responsibility for redressing constitutional violations ... since the entire point of police conduct that violates the Fourth Amendment is to obtain evidence for use at trial." *Id.* at 978, 104 S.Ct. 3405 (Stevens, J., concurring and dissenting). For, "[i]f such evidence is admitted, then the courts become not merely the final and necessary link in an unconstitutional chain of events, <u>but its actual motivating force</u>." *Id.* (emphasis added). Nor, according to Justice Stevens, "should we so easily concede the existence of a constitutional violation for which there is no remedy. To do so is to convert a bill of Rights into an unenforced honor code that the police may follow in their discretion." *Id.* at 978, 104 S.Ct. 3405.

The Court has since broadened the good-faith exception. In *Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), the Court applied the exception to cases where an officer conducts a search in objectively reasonable reliance on the constitutionality of a statute that is subsequently declared unconstitutional. 480 U.S. at 346, 107 S.Ct. 1160. Later, in *Arizona v. Evans,* 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995), the Court determined that the good faith exception to the exclusionary rule applied to evidence seized incident to the arrest of the defendant based on a warrant that had been quashed seventeen days prior to the arrest. 514 U.S. at 15–16, 115 S.Ct. 1185. According to the Court, the officer making the arrest acted in reliance on an inaccurate computer record indicating existence of an outstanding arrest warrant. *Id.* at 4–6, 115 S.Ct. 1185. However, because the erroneous information as to the outstanding arrest warrant apparently resulted from clerical errors of court employees, rather than the police, the evidence was not suppressed. *Id.* at 14–15, 115 S.Ct. 1185.

Then, in *Herring v. United States,* 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009), the Court expanded the good-faith exception and virtually eliminated Fourth Amendment protections by adopting an elevated standard for applying the exclusionary rule to police misconduct itself. There, incriminating evidence was seized in a search incident to arrest pursuant to an arrest warrant. 555 U.S. at 137–38, 129 S.Ct. 695. Due to an error in police records, however, the arrest warrant had been recalled five months earlier. *Id.* The defendant argued that because the police did not have a valid

arrest warrant, the fruits of the search had to be suppressed.

*Herring*, however, held that although the police may have been negligent in executing an invalid warrant, police negligence does not trigger suppression under the exclusionary rule. *See id.* at 140–47, 129 S.Ct. 695. According to the Court, "the exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'" *Id.* at 141, 129 S.Ct. 695 (citation omitted). The Court stated that "[e]xclusion" is only justified in cases where there is evidence of systemic recklessness or negligence, such as "reckless[ness] in maintaining a warrant system, or [ ] knowingly [making] false entries to lay the groundwork for future false arrests." *Id.* at 146, 129 S.Ct. 695. "When police mistakes are the result of negligence ... rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.'" *Id.* at 147, 129 S.Ct. 695.

Thus, the Court employed a cost-benefit test, first used in *Leon*, holding that in order to "trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price being paid by the justice system." *Herring*, 555 U.S. at 142–44, 129 S.Ct. 695. Turning *Mapp* on its head, the Court held that, unless the rule is used "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," the criminal should not "go free because the constable has blundered." *Herring*, 555 U.S. at 145, 148, 129 S.Ct. 695; *see also Davis v. United States*, —— U.S. ——, 131 S.Ct. 2419, 2439, 180 L.Ed.2d 285 (2011) (Breyer, J., dissenting) ("The Court's rationale for creating its new 'good faith' exception threatens to undermine well-settled Fourth Amendment law .... if [the Court] would apply the exclusionary rule only where a Fourth Amendment violation was 'deliberate, reckless, or grossly negligent, then the 'good faith' exception will swallow up the exclusionary rule.").

Thus, on the federal level, the application of the good-faith exception has effectively eliminated any Fourth Amendment protec-tion afforded by the probable cause requirement of the warrant clause and the reasonableness requirement for governmental searches. The safeguards provided by the exclusionary rule have been largely eviscerated. "*Herring* ... has weakened the exclusionary rule by rendering it inapplicable to 'police mistakes that are the result of negligence ... [and] foreshadows the elimination of the exclusionary rule altogether.'" Claire Angelique Nolasco, et. al., *What Herring Hath Wrought: An Analysis of Post–Herring Cases in the Federal Courts*, 38 Am. J. Cr. L. 221, 230 (2011) (quoting *United States v. Jones*, 620 F.Supp.2d 163, 177 (D.Mass. 2009)). Moreover, "[i]f the *Herring* opinion stands for the proposition that all illegally seized evidence will be admissible so long as the police did not act culpably, then the warrant requirement will be significantly weakened, if not nullified .... a general reasonableness standard would govern the Fourth Amendment, and the warrant requirement would not be much of a requirement at all." Matthew Allan Josephson, *To Exclude or Not Exclude: The Future of the Exclusionary Rule After Herring v. United States*, 43 Creighton L.R. 175, 196 (2009). "The holding in *Herring* finds little support in the Chief Justice's opinion for the majority, which perhaps accurately reflects his apparent longstanding opposition to the exclusionary rule, but is totally unconvincing and in many respects irrelevant and disingenuous." Wayne R. LaFave, *The Smell of Herring: A Critique of the Supreme Court's Latest Assault on the Exclusionary Rule*, 99 J. Crim. L. & Criminology 757, 759 (2009) (citing Adam Liptak, *Justices Step Closer to Repeal of Evidence Ruling*, N.Y. Times, Jan. 30, 2009, at A1 (noting that back in 1983, Chief Justice Roberts, then a lawyer in the Reagan White House, "was hard at work on what he called in a memorandum 'the campaign to amend or abolish the exclusionary rule'")).

## II.

However, "[s]tate courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the

United States Constitution." *Evans,* 514 U.S. at 8, 115 S.Ct. 1185. It has long been settled that "as long as we afford defendants the minimum protection required by the federal constitution, we are free to provide broader protection under our state constitution." *State v. Lopez,* 78 Hawai'i 433, 445, 896 P.2d 889, 901 (1995) (citing *State v. Quino,* 74 Haw. 161, 170, 840 P.2d 358, 362 (1992); *State v. Texeira,* 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967)). Thus, "when the [ ] Supreme Court's interpretation of a provision present both in the United States and Hawai'i Constitutions does not adequately preserve the rights and interests sought to be protected, we will not hesitate to recognize the appropriate protection as a matter of state constitutional law." *State v. Bowe,* 77 Hawai'i 51, 57, 881 P.2d 538 544 (1994).

It is established that the Hawai'i Constitution provides greater protection for individual liberties than those afforded under the United States Constitution. Article I, section 7 of the Hawai'i Constitution states:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and persons or things to be seized or the communications sought to be intercepted."

Haw. Const. art. I, § 7 (emphasis added). This provision of the Hawai'i Constitution "provides broader protection than the [F]ourth [A]mendment to the United States Constitution because it also [expressly] protects against unreasonable invasions of privacy." *State v. Dixon,* 83 Hawai'i 13, 23, 924 P.2d 181, 191 (1996) (emphasis added); *see also Torres,* 125 Hawai'i at 396, 262 P.3d at 1020 ("[Our exclusionary rule is] unlike the exclusionary rule of the federal government and some other jurisdictions insofar as it guarantees individual privacy rights"); *State v. Navas,* 81 Hawai'i 113, 123, 913 P.2d 39, 49 (1996) ("[A]rticle I § 7 of the Hawai'i Constitution [provides a more] extensive right of privacy ... than that of the United States

Constitution."); *Lopez,* 78 Hawai'i at 445, 896 P.2d at 901 ("Unlike the exclusionary rule on the federal level, Hawaii's exclusionary rule serves not only to deter illegal police conduct, but to protect the privacy rights of our citizens."); *State v. Tanaka,* 67 Haw. 658, 662, 701 P.2d 1274, 1276 (1985) ("In our view, article I, § 7 of the Hawai'i Constitution recognizes an expectation of privacy beyond the parallel provisions in the Federal Bill of Rights.").

Specifically, "the purpose of ... article I, section 7 is to protect individuals against intrusions by the government." *State v. Kahoonei,* 83 Hawai'i 124, 129, 925 P.2d 294, 299 (1996) (emphasis in original). Thus the Hawai'i constitution is not limited to protection against police misconduct but "ensure[s] that an individual's legitimate expectations of privacy will not be subjected to unreasonable governmental intrusions.... The basic purpose ... is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Id.* (citing *State v. Meyer,* 78 Hawai'i 308, 311–12, 893 P.2d 159, 162–63 (1995)) (emphasis in original)(emphasis added). This guarantee originates from "our view that the right to be free of 'unreasonable' searches and seizures under article I, section 7 ... is enforceable by a rule of reason which requires that governmental intrusions into the personal privacy of citizens of this State be no greater in intensity than absolutely necessary." *Lopez,* 78 Hawai'i at 446, 896 P.2d at 902 (citing *State v. Kaluna,* 55 Haw. 361, 369, 520 P.2d 51, 58–59 (1974)). This view comports with that of the dissenters in *Leon,* who argued that when courts admit unlawfully seized evidence in a trial, the judiciary becomes part of the governmental action prohibited by the Fourth Amendment. *See Leon,* 468 U.S. at 954, 104 S.Ct. 3405 (Brennan, J., dissenting, joined by Marshall, J.); *Leon,* 468 U.S. at 970–77, 104 S.Ct. 3430 (Stevens, J., dissenting) (arguing that since the point of collecting evidence is to use it at trial, if evidence obtained in violation of the Fourth Amendment is not suppressed, courts become the final link and motivating force behind the constitutional violation).

### III.

Petitioner/Defendant–Appellee Robert J. McKnight, Jr. (McKnight) argues that the exclusionary rule must apply to the evidence seized from his home on July 6, 2006 because the misdated warrant authorizing the search and seizure was facially invalid. In response, Respondent/Plaintiff–Appellant State of Hawaiʻi (the State) contends that because the warrant stated that it "may be served and the search made on or before July 16.2006, a date not to exceed ten (10) days <u>from the issuance of this search warrant</u>," and the warrant was in fact issued and executed on July 6, 2006, the warrant was not invalid. (Emphasis added.) However, at the bottom of the search warrant, the warrant stated, "GIVEN UNDER MY HAND, and dated this 6th day of June, 2006, at Wailuku, County of Maui, State of Hawaiʻi." (Emphases added.)

### A.

The majority contends that "there is no requirement under the Hawaiʻi constitution, HRS, or HRPP that the issuing judge must write the exact date of issuance on all search warrants." Majority's opinion at 382 n. 1, 319 P.3d at 301 n. 1. Respectfully, this is misleading in the context of this case, because HRPP Rule 41© states that "[the warrant] shall command the officer to search, <u>within a specified period of time not to exceed 10 days,</u> the person or place named for the property specified." HRPP Rule 41© (emphasis added). Thus, although the warrant need not have the exact date of issuance, it must specify a time period for the warrant's execution.

In stating that there is no requirement for an issuance date to be listed on the warrant, the majority suggests that the date may be inexact as written on the warrant, but the warrant would still be valid. However, this is directly contrary to the requirement of Rule 41© that the warrant specify a "period of time not to exceed 10 days." This ten day limitation protects against stale warrants, where evidence may have been moved from the places described in the warrant or consumed. *Cf. Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 890 (1991) (warrant was constitutionally defective and probable cause was lacking where warrant failed to set forth a time frame in which the informants had observed marijuana at the defendant's residence).[5]

In this case, "the specified period of time" was unclear on the face of the warrant, and thus HRPP Rule 41© was not satisfied, contrary to the majority's suggestion. The warrant states that it was "Given", i.e., issued, by the district court on the stated date of June 6, 2006. Under one reading of the warrant, the June date, apparent on the face of the warrant, would indicate that the warrant was valid from June 6, 2006 ("the issuance of this search warrant") through July 16, 2006. This would directly violate Rule 41©, which states that the specified period of time is "not to exceed 10 days." Another reading of the warrant would be that it was valid for ten days following the June 6, 2006 date, indicating that the warrant was valid from June 6, 2006 through June 16, 2006. However, as a consequence, the warrant would have been expired on the date of McKnight's arrest and the search of his home and vehicle.

Furthermore, in *Edmunds,* the issue was not that the affidavit lacked "requisite facts", but rather that the "warrant failed to set forth <u>a time frame</u> in which the informants had observed marijuana." 586 A.2d at 890 (emphasis added). Thus, *Edmunds* pertains to defects that arise because of erroneous dates. Moreover, in *Benson,* the Pennsylvania court required that where there was a mis-dating on the warrant, the warrant would only be invalid if the defendant could show prejudice. 10 A.3d at 1274. This position was rejected in *Endo,* where, interpreting the Hawaiʻi Constitution, it was held that a mis-dating on the warrant resulted in invalidation without the defendant having to show prejudice. *Endo,* 83 Hawaiʻi at 94, 924 P.2d at 588.

---

**5.** In connection with this reference to the *Edmunds* case, the majority observes that in a separate Pennsylvania case, *Commonwealth v. Benson,* 10 A.3d 1268 (Pa.Super.Ct.2010), the Pennsylvania Superior Court held that the "technical" defect present in a warrant did not render it invalid. Majority's opinion at 395 n. 19, 319 P.3d at 314 n. 19 (citing *Benson,* 10 A.3d at 1274). However, the citation herein to a Pennsylvania case, *Edmunds,* is not for the purpose of suggesting that Hawaiʻi comprehensively adopt that state's search and seizure jurisprudence. Instead, *Edmunds* is simply illustrative of the tenet that warrants may become stale if time limitations are not established and enforced. *See Edmunds,* 586 A.2d at 890.

Under these circumstances, the warrant cannot be said to have included a "specified period of time" during which a police officer could conduct the search. HRPP Rule 41(b). The warrant was thus clearly invalid. The majority resorts to evidence <u>outside</u> the four corners of the warrant in order to construe it as valid, using the officer's affidavit. *See* majority's opinion at 3. However, a warrant must be regular on its face, so that police know they are authorized to conduct a particular search and the person searched knows that the police are acting under a lawful court order. *See United States v. Chadwick,* 433 U.S. 1, 9, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (noting that the particularity requirement in a warrant "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.") (citations omitted), *abrogated on other grounds by California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).[6] To require anything less would be to undermine confidence in the validity of warrants as authorizing government intrusion into an otherwise protected zone of privacy. The majority would require an individual to cede privacy in his or her home when faced with an invalid warrant, despite the fact that " '[p]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *State v. Lopez,* 78 Hawai'i 433, 442, 896 P.2d 889, 898 (1995) (quoting *United States v. United States District Court Eastern District of Michigan,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)).

Respectfully, by characterizing the error in this case as a "technical" or "scrivener's" error, the majority depreciates the importance of the warrant requirement. What is at stake is not merely a question of a "scrivener's error", but rather, an invasion of a person's privacy. *See State v. Wallace,* 80 Hawai'i 382, 393, 910 P.2d 695, 705 (1996) ("The basic purpose of [art. 1, § 7 of the Hawai'i Constitution] is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.") (citation and internal quotation marks omitted).

The majority's solution to any inadequacies in the warrant is to look to external evidence, including the supporting affidavit, which, according to the majority "refutes any notion that the search warrant was signed on June 6, 2006." Majority's opinion at 394, 319 P.3d at 313. Thus, the majority would require the person searched to, in effect, construe the warrant and the affidavit together to determine if the warrant was valid. Respectfully, this approach amounts to a post hoc justification of a warrant that is obviously invalid on its face. *See Groh v. Ramirez,* 540 U.S. 551, 557, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) ("The fact that the <u>application</u> adequately described the 'things to be seized' does not save the <u>warrant</u> from its facial invalidity. The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents.") (emphases in original)[7].

HRPP Rule 41(d) requires that "[t]he officer taking property under the warrant shall give to the person from whom or from whose

**6.** The U.S. Supreme Court has established that "If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached.... If the state court decision <u>indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, [the Supreme Court], of course, will not undertake to review the decision.</u>" *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). This opinion rests on "bona fide separate, adequate, and independent grounds" under the Hawai'i Constitution, and federal cases obviously "do not ... compel the result" this

opinion reaches. See *id.;* see also *Arizona v. Evans,* 514 U.S. at 8 ("We believe that *Michigan v. Long* properly serves its purpose and should not be disturbed. Under it, state courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution.").

**7.** Although the U.S. Supreme Court in *Groh* allowed for the possibility that a warrant may incorporate other documents by reference, it noted that such documents must accompany the warrant. *Groh,* 540 U.S. at 558, 124 S.Ct. 1284. As noted, in this case it is not clear from the record whether the affidavit was provided to McKnight.

premises the property was taken a copy of the warrant and receipt at the place from which the property was taken." However, there is no requirement for an officer to serve the supporting affidavit, and in this case, the record is not clear as to whether McKnight was given a copy of the affidavit.[8] Under these circumstances, McKnight would have no way of knowing whether the warrant was in fact valid.

First, even assuming that the affidavit was provided to McKnight, by resorting to the use of extrinsic evidence to interpret the warrant's validity, the majority imposes on parties searched an obligation to interpret conflicting documents and to do so at their peril. The party upon whom the warrant is served is not privy to communications between the police officers and the court, nor usually schooled in judicial interpretation of legal documents. Accordingly, as noted, the warrant must serve to "assure[ ] the individual whose property is searched or seized of the lawful authority of the executing officer," *Chadwick*, 433 U.S. at 9, 97 S.Ct. 2476 (citing *Camara v. Municipal Court*, 387 U.S. 523, 532, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)), not put the individual to an inquiry of the documents.

In this case, the majority would prescribe a duty on the party searched to construe the warrant "in pari materia" with any supporting affidavits to determine whether the warrant was valid and to ascertain which of the conflicting dates on the face of the warrant should be used to measure the 10 day requirement. Under the majority's approach, a lay person must therefore interpret multiple legal documents, including an ambiguous warrant, in order to decide whether he or she should accede to a search by police. Respectfully, it would appear painfully obvious that this burden violates the principle that the person upon whom the warrant is served must be informed that there is an adequate basis for the warrant. Therefore, warrants must be plainly valid on their face. *See Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[P]osession of a

warrant by officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct.").

Second, if McKnight was not provided with the affidavit, then the majority's approach is even more problematic. On its face, the warrant contains conflicting provisions as to whether it was valid from June 6th through July 16th, or from June 6th through June 16th. Either reading of the warrant would violate HRPP Rule 41(b), as explained above. There are also practical ramifications that arise if a search is conducted pursuant to a facially invalid warrant. For example, in *Groh*, the Ninth Circuit's decision noted that "the warrant's facial defect 'increased the likelihood and degree of confrontation between the [individuals subject to search] and the police' and deprived [such individuals] of the means 'to challenge officers who might have exceeded the limits imposed by the magistrate.'" *Groh*, 540 U.S. at 556, 124 S.Ct. 1284 (quoting *Ramirez v. Butte–Silver Bow County*, 298 F.3d 1022, 1029 (9th Cir. 2002)); *see also* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.12(a) (4th ed. 2004) (having a copy of the warrant allows the person to be searched "know that there is a color of authority for the search, and that he is not entitled to oppose it by force.") (quoting *Model Code of Pre–Arraignment Procedure* § 132 (1975)). Therefore, in order to ensure searches are safely and properly executed, warrants must be valid on their face and not conditioned on external documents that may or may not be present at the scene of the search.

Notwithstanding the majority's arguments as to the interpretation of the dates listed on the face of the warrant, June 6th and July 16, the disposition in this case should have been evident. This jurisdiction had already established, over a decade ago, that a misdated warrant is invalid, and evidence seized as a result must be suppressed. *See Endo*, 83 Hawai'i at 94, 924 P.2d at 588 (upholding the trial court's granting of the defendant's Mo-

---

**8.** It is not clear from the record if anyone was present at McKnight's home at the time the warrant was executed. McKnight was in custody on that date, and had indicated that he lived with his mother and sister. This would not affect our analysis, inasmuch as the evidence seized was ultimately used against McKnight.

tion to Quash Search Warrant and Suppress Evidence where the police officer wrote the wrong date on the warrant). *Cf. State v. Williams*, 57 Ohio St.3d 24, 565 N.E.2d 563 (1991) ("The issue presented to this court is whether a search warrant is void ab initio when the face of the document lacks a judge's signature. We find that it is. Therefore, any evidence obtained pursuant to such a search warrant must be suppressed."); *State v. Surowiecki*, 184 Conn. 95, 440 A.2d 798 (1981) (concluding that a search warrant that had not been signed by a judge prior to the search did not issue under Connecticut law). The purpose for this rule, as discussed above, should be self-evident.

### B.

As noted before, by affirming the ICA's decision, the majority implicitly adopts the ICA's reasoning in its opinion and the ICA's reversal of *Endo*, which was the prior prevailing law in this jurisdiction on this issue. *See McKnight*, 128 Hawai'i at 342, 289 P.3d at 978. Inasmuch as the ICA's opinion represents a fundamental change in this jurisdiction's analysis of the exclusionary rule, and the majority has, in effect, affirmed that analysis, the ICA's opinion is discussed in detail herein.

Prior to the ICA's decision in the instant case, we held that there are three purposes underlying our exclusionary rule: protection of individual privacy, judicial integrity, and the deterrence of police misconduct. *Torres*, 125 Hawai'i at 394, 262 P.3d at 1018; *see State v. Bridges*, 83 Hawai'i 187, 195, 925 P.2d 357, 365 (1996) ("In Hawai'i, we have recognized a number of purposes underlying our exclusionary rule: (1) judicial integrity, *State v. Pattioay*, 78 Hawai'i 455, 468, 896 P.2d 911, 924 (1995) ("to ensure that evidence

illegally obtained by government officials or their agents is not utilized in the administration of criminal justice through the courts"); (2) individual privacy, [*Lopez*,] 78 Hawai'i at 446, 896 P.2d [at] 902[ ]("to protect the privacy rights of our citizens" [ ]; and, of course); (3) deterrence, *Pattioay*, 78 Hawai'i at 468, 896 P.2d at 924 ("to deter illegal police conduct").).

*Torres* reaffirmed the foundational three purposes of the exclusionary rule in our state. 125 Hawai'i at 394, 262 P.3d at 1018 ("An exclusionary rule analysis requires us to consider the [three] principles served by that rule."). *Torres* referenced *Lopez* to reaffirm the two purposes identified in *Lopez*, and pointed out that "unlike the exclusionary rule on the federal level, Hawai'i's exclusionary rule serves not only to deter police misconduct, but to protect the privacy rights of our citizens."[9] *Torres*, 125 Hawai'i at 396, 262 P.3d at 1020 (emphasis added) (quoting *Lopez*, 78 Hawai'i at 445, 896 P.2d at 901). Additionally, *Torres* plainly mandated that judicial integrity be considered as a third, fundamental purpose in an exclusionary rule analysis. As explained below, in applying *Lopez* to the instant case and in ignoring *Torres*, the ICA gravely erred by addressing only two out of the three purposes underlying our state's exclusionary rule. Respectfully, the ICA was also wrong in concluding that the two purposes it discussed, protection of privacy rights and deterrence, would not be furthered by suppression in this case.[10]

### IV.

In its opinion, the ICA held that "misdating of the warrant does not require suppression of the search warrant evidence." *McKnight*, 128 Hawai'i at 340, 289 P.3d at

9. The majority states that "[n]otably," McKnight initially argued that there were insufficient facts to establish probable cause to issue the search warrant, and only later argued that the search warrant was facially invalid. Majority's opinion at 382–83, 319 P.3d at 301–02. It is not clear why this is relevant. If the search warrant was invalid, either because of a lack of probable cause or because of an error on the face of the warrant, the evidence seized pursuant to that warrant should be suppressed, as the circuit court ordered.

10. The majority holds that "the only basis to suppress the evidence obtained pursuant to the search warrant in this case would be the issuing judge's typographical error." Majority's opinion at 398, 319 P.3d at 317. The error on the search warrant in this case cannot be characterized as a "typographical error." Inasmuch as the date was handwritten, it was not the result of a typographical error, but plainly that of the issuing judge's act.

976. In so holding, the ICA "overrule[d] [its own] prior decision in [*Endo* ]." *Id.* at 342, 289 P.3d at 978. In *Endo*, under similar circumstances, the ICA held that a misdated search warrant was invalid. 83 Hawai'i at 94, 924 P.2d at 588. There, a police officer misdated a search warrant April 14, 1992, which was submitted for a judge's signature on May 14, 1992. *Id.* at 88, 924 P.2d at 582. *Endo* held that "the Hawai'i Constitution does not permit the validation of searches pursuant to search warrants that are facially expired when the searches are made." *Id.* at 94, 924 P.2d at 588.

Eschewing its prior decision in *Endo*, the ICA, herein, reversed the circuit court, citing *Lopez* to support its view that neither the deterrence of governmental misconduct nor the protection of the privacy rights of our citizens, "would be furthered by suppressing the evidence seized pursuant to the search warrant." *McKnight*, 128 Hawai'i at 341, 289 P.3d at 977. However, neither the majority nor the ICA justify the abrogation of *Endo*.

*Endo* is directly on point, and grounds its holding in the protections afforded individual privacy by the Hawai'i Constitution both in article I, section 6 and in Hawai'i's counterpart to the exclusionary rule, at article I, section 7. Under our Constitution, in article I, section 6, government intrusion is justified only if "absolutely necessary[,]" and, "unlike the federal [constitution], article I, section 7 specifically protects against invasions of privacy." *Endo*, 83 Hawai'i at 93, 924 P.2d at 583 (quoting *Lopez*, 78 Hawai'i at 446, 896 P.2d at 902).

Our willingness to afford greater protection of individual privacy rights than is provided on the federal level arises from our view that the right to be free of 'unreasonable' searches and seizures under article I, section 7 of the Hawai'i Constitution is enforceable by a rule of reason which requires that governmental intrusions into the personal privacy of citizens of this State be no greater in intensity than absolutely necessary. Thus, each proffered justification for a warrantless search must

meet the test of necessity inherent in the concept of reasonableness.

Moreover, unlike its federal counterpart, article I, section 7, specifically protects against invasions of privacy.

Although we acknowledge that the Hawai'i exclusionary rule serves the valuable purpose of deterring governmental officials from circumventing the protections afforded by the Hawai'i Constitution, we now pronounce that an equally valuable purpose of the exclusionary rule under article I, section 7, is to protect the privacy rights of our citizens.

*Id.* (brackets and alterations omitted) (quoting *Lopez*, 78 Hawai'i at 445–46, 896 P.2d at 901–02 (emphasis added) (internal quotation marks and citations omitted)). By totally ignoring the precedent set in *Endo* and the basis for that holding, the majority and the ICA overturn the privacy protections with respect to search warrants provided by the Hawai'i Constitution, as discussed in *Endo*. This contradicts established principles of decision-making to which this court has adhered.

"[A] court should 'not depart from the doctrine of stare decisis without some compelling justification.'" *State v. Garcia*, 96 Hawai'i 200, 206, 29 P.3d 919, 925 (2001) (internal quotation marks and citations omitted). *See also State v. Romano*, 114 Hawai'i 1, 11, 155 P.3d 1102, 1112 (2007) ("[A] court should not depart from the doctrine of stare decisis without some compelling justification." (internal quotation marks and citation omitted)). In this case, there was no discussion whatsoever of the basis for reversing *Endo*'s reliance on privacy protections provided under the Hawai'i Constitution. Thus, there was absolutely no compelling justification for overturning *Endo*.

A.

Because it relied solely on *Lopez* and neglected to apply *Torres*, the ICA's decision conflicts with precedent.[11] The exclusionary rule preserves judicial integrity by ensuring

11. This section also responds to the State's argument that the ICA's decision does not compromise the integrity of our judiciary.

that courts do not "place their imprimatur on evidence that was illegally obtained by allowing it into evidence...." *Torres*, 125 Hawai'i at 394, 262 P.3d at 1018 (citing *Bridges*, 83 Hawai'i at 196, 925 P.2d at 366). As we have held, "if state courts admit[ ] evidence in a state prosecution that was obtained in a manner that would be unlawful under our constitution, our courts would necessarily be placing their imprimatur on evidence that would otherwise be deemed illegal, thus compromising the integrity of our courts." *Id.; see also Leon*, 468 U.S. at 937, 104 S.Ct. 3430 (Brennan, J., dissenting, joined by Marshall, J.) (explaining "seizures are generally executed for the purpose of bringing 'proof to the aid of the Government ... [thus] the utility of such evidence in a criminal prosecution arises ultimately in the context of the courts, and [ ] the courts therefore cannot be absolved of responsibility for the means by which evidence is obtained.'" (internal citation omitted) (emphasis added)).

In this jurisdiction's view, "[t]he purpose of ... article I, section 7 is to protect individuals against intrusions by the government." *Kahoonei*, 83 Hawai'i at 129, 925 P.2d at 299 (emphasis in original). Hence, this court has not agreed with or followed the Supreme Court's reasoning in *Leon* to the effect that errors by judges or magistrates are immune to the exclusionary rule because they "are not adjuncts to the law enforcement team" and instead are "neutral judicial officer[s] [who] have no stake in the outcome of particular criminal prosecutions." *Leon*, 468 U.S. at 917, 104 S.Ct. at 3417. An error on the date of a warrant renders the warrant invalid irrespective of which governmental hand committed it. As has long been established in this jurisdiction, it is immaterial if it was "the mistake of the officer who applied for it, the judge who signed it, and/or the officer who executed it." *Endo*, 83 Hawai'i at 94, 924 P.2d at 588 (emphasis added).

### B.

There is no basis in fact, law, or precedent for overturning the foregoing rule as the ICA did, and as affirmed by the majority. In *Endo*, a police officer mistakenly typed the wrong date on a search warrant that he submitted to a judge for signature, thereby rendering the warrant invalid. Since a mistake could be made by either a police officer or a judge, the ICA considered it necessary to caution judges as well as police officers "not to prepare, sign, and execute facially expired search warrants." *Endo*, 83 Hawai'i at 94, 924 P.2d at 588. *Endo* was correct that the Hawai'i Constitution "does not permit the validation of searches pursuant to search warrants that are facially expired when the searches are made." *Id.*

Accordingly, a distinction between an error by a judge and an error by police officer, while recognized under the federal constitution, is not constitutionally warranted, under the Hawai'i Constitution. Here, as in *Endo*, a search conducted pursuant to a search warrant that is facially expired is not valid. An error by the hand of either a police officer or a judge is not excused to the detriment of privacy rights. Under Article I, section 7, this court must abide by a commitment to the "imperative of judicial integrity" because, as stated in *Mapp*, the failure of government to abide by its own laws is destructive of the rule of law. *Mapp*, 367 U.S. at 659, 81 S.Ct. 1684. If government does not follow the law, "it breeds contempt for [the] law." *Id.* The ICA erred, *inter alia*, because *Torres* requires consideration of whether suppression furthers the goal of maintaining judicial integrity, and in this case, for the reasons stated *supra*, it clearly does.

### C.

Unlike the ICA, the majority does in fact consider the "judicial integrity" purpose of the exclusionary rule, *Torres*, 125 Hawai'i at 394, 262 P.3d at 1018, but its conclusion on this issue summarily assumes that the search warrant was not illegal. The majority states that "there is no harm to judicial integrity in admitting the seized evidence at issue because the mere scrivener's error in the issuance date did not result in an unreasonable invasion of McKnight's privacy[,]" and "[a]ccordingly, admitting the seized evidence ... in no way compromises judicial integrity." Majority's opinion at 399, 319 P.3d at 318.

Respectfully, it is difficult to understand the majority's belief that the search was not an unreasonable invasion of privacy, since McKnight's privacy was invaded based on the subject warrant. Maintaining that the warrant was legal assumes that the defendant was bereft of constitutional protections against a warrant that failed to authorize the search of the premises and seizure of the items. Whether the warrant was supported by probable cause and executed within 10 days of July 6, 2006, is not enough to render legal what would be an otherwise invalid warrant. Correspondingly, it does not render legal what would be an otherwise invalid search. Thus, judicial integrity can only be sustained by the suppression of the evidence obtained in the search.

## V.

The ICA also erred in its analysis of whether suppression would further the two other purposes of the exclusionary rule, the deterrence of police misconduct,[12] and the protection of individual privacy. The ICA's analysis in this case adopts the cost-benefit language employed by federal courts rather than Hawai'i case law precedent. The ICA states:

> The exclusionary rule imposes a significant and weighty cost on the judicial process and society by requiring the courts to ignore reliable and trustworthy evidence that has a direct bearing on a defendant's guilt. Where exclusion of the evidence is necessary to further other significant interests, such as deterring government misconduct or protecting privacy rights, the application of the exclusionary rule is justifiable.

*McKnight*, 128 Hawai'i at 341, 289 P.3d at 977 (emphases added). Although the ICA does not cite to any federal case law, it is clear that its reasoning parallels that from

U.S. Supreme Court cases such as *Leon, Herring,* and *Hudson. See, e.g., Leon,* 468 U.S. at 906–907, 104 S.Ct. 3405 ("Whether the exclusionary sanction is appropriately imposed in a particular case ... must be resolved by weighing the costs and benefits of preventing the use in the prosecution's case.")[13] Hawai'i has not adopted the cost-benefit analysis employed by the U.S. Supreme Court because Hawai'i has not rejected but reaffirmed the basis for the exclusionary rule. *See Torres,* 125 Hawai'i at 396, 262 P.3d at 1020. Thus, the ICA gravely erred when it adopted the federal approach in determining whether the exclusionary rule should be applied in our state and under the Hawai'i Constitution.

### A.

#### 1.

The ICA decided that suppression would not "deter law enforcement or governmental misconduct." *McKnight,* 128 Hawai'i at 341, 289 P.3d at 978. In its brief analysis on this point, the ICA reasoned that "Agent Domingo properly prepared the search warrant [and affidavit], supported by probable cause, which he submitted to a judge for approval." *Id.* In effect, the ICA adopts the good faith exception to the exclusionary rule by reasoning, as the U.S. Supreme Court did in *Leon,* that the evidence need not be suppressed because the officers acted reasonably, and that the fault, if any, for the irregularities in the warrant lay with the court that issued it. *See id.*

But this ignores and entirely exculpates the police officer or officers who received the warrant from the judge and proceeded to execute it, even though the discrepancy on the face of the warrant should have been obvious to the officers. In the first place, the ICA's reasoning, as discussed above, is contrary to Hawai'i law. This jurisdiction's

12. This section also responds to the State's argument that the ICA's decision does not undermine the exclusionary rule's goal of deterring police misconduct.

13. *See also Herring,* 555 U.S. at 141, 129 S.Ct. 695 (" '[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be

weighed against [its] substantial social costs.' ") (quoting *Illinois v. Krull,* 480 U.S. 340, 352–353, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (internal quotation marks omitted)); *Hudson,* 547 U.S. at 596, 126 S.Ct. 2159 ("Next to these 'substantial social costs' we must consider the deterrence benefits, existence of which is a necessary condition for exclusion.").

precedent plainly rejected the good faith exception to the exclusionary rule.[14] *See Lopez*, 78 Hawaiʻi at 446, 896 P.2d at 902. Second, it cannot be said the conduct of the officers was objectively reasonable. It should have been apparent to the officers from the face of the warrant that because of the discrepancy in the dates, the warrant was expired or defective. Thus, it was not objectively reasonable for the officers to rely on the warrant. Seemingly, their conduct would not fall within the good faith exception to the exclusionary rule even were it to apply. For argument's sake, to the extent, thus, that the ICA holds and the majority affirms that the exclusionary rule would not apply in this case, that holding apparently extends even <u>beyond</u> the good faith exception under *Leon*.

Additionally, the question on the federal level, where the sole focus under the exclusionary rule is to deter police misconduct, is whether the evidence seized in this case may be admitted under *Herring*'s elevated standard for suppression if the officers were found to be only negligent. However, if the officers knew of the defect but proceeded to execute the search warrant, their conduct would be considered "reckless" and the evidence suppressible under *Herring*, 555 U.S. at 146–147, 129 S.Ct. 695 (2009). Again, for argument's sake, the ICA's position that the evidence should not be suppressed, and the majority's concurrence, seemingly exceed <u>even</u> the limits drawn by the U.S. Supreme Court in *Herring*. *Id.*

Under Hawaiʻi's Constitution, the exclusionary rule encourages conscientious police conduct, and mandates a level of awareness that discourages invasion of individual privacy. It is not unreasonable then, to impress upon the police executing the warrant, the importance of reviewing the document to ensure that the warrant is valid. This is necessary because the execution of an invalid warrant results in the invasion of an individual's right to privacy, whether the invasion arises from a lack of probable cause, or defective warrants, like the one in this case.

Inasmuch as the exclusionary rule generally serves to deter police officers from subsequent misconduct, suppressing evidence in this case would encourage police officers in the future to review warrants prior to executing them. *See Endo*, 83 Hawaiʻi at 94, 924 P.2d at 588 ("The [error] may be the mistake of the officer who applied for it, the judge who signed it, and/or the officer who executed it.... [W]e conclude that the Hawaiʻi Constitution does not permit the validation of searches pursuant to search warrants that are facially expired when the searches are made.").

### 2.

The majority's analysis with respect to this issue is relatively brief, but it echoes some of the ICA's problematic reasoning, and would also exculpate the police officer or officers, who received the warrant from the judge and proceeded to execute it, from responsibility in executing a facially defective warrant. *See* majority's opinion at 384, 319 P.3d at 303. The majority alleges that "simply stated, no illegal police conduct occurred." Again, as with its discussion of the judicial integrity rationale, the majority assumes what is in issue—whether the warrant was valid—and assumes that it was, thus concluding that the search was legal.

However, as noted, the police were either (1) negligent in their failure to recognize an obvious discrepancy in the warrant, or (2) reckless in conducting the search even though they knew the warrant contained conflicting dates with respect to its issuance and execution. As discussed, suppressing the evidence obtained in the search would serve to encourage police to ensure a warrant's facial validity, and discourage them from choosing to ignore a defective warrant and proceeding with a search or seizure anyway.

### B.

Manifestly, Hawaiʻi's exclusionary rule protects individual privacy rights, as incorporated in article I, section 7 of the Hawaiʻi Con-

---

14. *See also State v. Matsunaga*, 82 Hawaiʻi 162, 168, 920 P.2d 376, 382 (App.1996) (explaining that the Hawaiʻi Supreme Court appeared to reject the good faith exception in *Lopez*, 78 Ha-

waiʻi at 446, 896 P.2d at 902, and that if Hawaiʻi did recognize the good-faith exception rule, it would not apply to the facts of the case). *See Torres*, 125 Hawaiʻi at 396, 262 P.3d at 1020.

stitution. *Torres*, 125 Hawai'i at 396, 262 P.3d at 1020. In *Lopez*, this court pronounced that the protection of the privacy rights of citizens is a purpose "equally valuable" to that of deterring governmental misconduct. 78 Hawai'i at 446, 896 P.2d at 902. This third purpose underlying Hawai'i's exclusionary rule, protecting the individual right to privacy, is guaranteed by the Hawai'i Constitution's unreasonable search and seizure clause and by the express protection for individuals against intrusions by government. *See Kahoonei*, 83 Hawai'i at 129, 925 P.2d at 299.

### 1.

As to this purpose, the ICA held that "the suppression of the search warrant evidence [in this case] would also not serve to protect the privacy rights of our citizens."[15] *McKnight*, 128 Hawai'i at 341, 289 P.3d at 977. According to the ICA, suppression of the evidence "would only serve to benefit those who were validly subject to search, but by pure fortuity happened to draw an issuing judge who made a clerical error in signing the warrant." *Id.* at 341–42, 289 P.3d at 977–78.

First, this contention is circular because it assumes what is at issue, i.e. that government "entitlement to search McKnight's residence" was "established." But whether the government was entitled to search in the first place rests on the question of whether the warrant was valid under our law. If not, then the warrant did not authorize, i.e. "entitle," the police to enter the premises.

Since, in this case, the warrant was facially defective, the police did not have authorization to search McKnight's home, and thus there can be no question that the search invaded McKnight's privacy. "The sanctity of one's abode has been embedded in our

common law tradition even before the origins of our nation." *State v. Harada*, 98 Hawai'i 18, 41, 41 P.3d 174, 197 (Acoba, J., concurring in part and dissenting in part) (citation omitted). Obviously, then, "governmental agents [were not] clearly [entitled] to search[.]" *McKnight*, 128 Hawai'i at 341, 289 P.3d at 977.

Further, this court has not viewed the proper issuance of a warrant as depending on whether or not a particular circumstance was "draw[n]" to the benefit or disadvantage of the defendant or the police, as the ICA posits. Respectfully, such a view evinces an hostility to the protection of privacy rights. The privacy right cannot be demeaned by minimizing its invasion as simply a matter of drawing the wrong judge. The defect in a search warrant may result from any number of causes. The fundamental question is whether the warrant is valid; if it is not, our constitution and case law bar evidence derived from its execution as the most effective way to protect the personal right of privacy. *See Kahoonei*, 83 Hawai'i at 132, 925 P.2d at 302. In a larger sense, the benefit from the exclusionary rule redounds to all: everyone benefits from the vigilant protection of constitutional rights and from maintaining the rule of law.[16]

### 2.

With respect to individual privacy rights, the majority concludes that suppression would not serve to protect those rights. Majority's opinion at 383, 319 P.3d at 302. The majority joins in the ICA's contention that "the search would not have been conducted in a different manner or time had the court written the correct issuance date on the jurat[,]" and so no greater invasion of McKnight's privacy occurred as the result of the error. *Id.* at 383, 319 P.3d at 302. Thus,

---

15. This section also responds to the State's argument that the ICA's decision does not undermine the goal of protecting the privacy rights of our citizens.

16. The exclusionary rule serves to uphold the basic historical tenet of privacy in one's own home:

"The poorest man may in his cottage bid defiance to all the force of the Crown. It may be frail—its roof may shake—the wind may blow

through it—the storm may enter, the rain may enter—but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!"

*Harada*, 98 Hawai'i at 40, 41 P.3d at 196 (Acoba, J., concurring) (quoting *Frank v. Maryland*, 359 U.S. 360, 378–79, 79 S.Ct. 804, 3 L.Ed.2d 877, (1959) (Douglas, J., dissenting) (other citations omitted)).

the majority would uphold the warrant, so long as the result would not have been different with respect to the search itself.

However, first, this conclusion allows police to ignore mandates with respect to what a valid warrant must contain, including the requirement of HRPP Rule 41 that the warrant "shall command the officer to search, within a specified period of time not to exceed 10 days[.]" HRPP Rule 41© (emphasis added). As noted, the warrant in this case did not accurately specify a period of time during which the officers could conduct the search.

Second, the specifications for what must be contained in a warrant are an extension of the warrant requirement's basic protection of the right of privacy. Thus, in conducting a search pursuant to a warrant that does not meet those specifications, the government violates that right. Had the correct date been on the warrant in the instant case, then there would have been no such invasion. However, here, contrary to the majority's conclusion, there was in fact an invasion of the right to privacy that should not have occurred.

Moreover, the majority adopts the ICA's argument that suppression only benefits those validly subject to search, but for fortuitously having a judge who made a clerical error. Majority's opinion at 383, 319 P.3d at 302 (quoting *McKnight*, 128 Hawai'i at 341–42, 289 P.3d at 977–78). Respectfully, this is a view that undermines the value of privacy rights. The fundamental question is whether the warrant is valid. The requirement that the police have a valid warrant—inclusive of all the required information and with the requisite underlying probable cause—serves to ensure that searches are conducted only when the appropriate protections are in place

in order to preserve the right to privacy. The majority's reference to this error as a "mere clerical error" ignores the consequences of such an error, that of depriving McKnight of the right to privacy under our case law, inasmuch as such an error is not inconsequential in its effect. *See Endo*, 83 Hawai'i at 94, 924 P.2d at 581.

## VI.

In support of its holding, the majority and the ICA cite cases from other jurisdictions.[17] Majority's opinion at 384, 319 P.3d at 303; *see also McKnight*, 128 Hawai'i at 342, 289 P.3d at 978 (citing *State v. Dalton*, 132 Or. App. 36, 887 P.2d 379 (1994) and *State v. Steffes*, 269 Mont. 214, 887 P.2d 1196, 1210 (1994)). However, *Endo* specifically rejected *Dalton* and *Steffes*, cited by both the ICA and the majority in this case. *See Endo*, 83 Hawai'i at 94 n. 7, 924 P.2d at 588 n. 7. In distinguishing those cases, *Endo* emphasized, among other things, "the uniqueness of Hawaii's Constitution [and] the specificity requirements imposed by HRPP Rule 41©" in concluding that "the Hawai'i Constitution does not permit the validation of searches pursuant to search warrants that are facially expired when the searches are made." *Id.* at 94, 924 P.2d at 588. As noted, neither the ICA nor the majority set forth any rationale for why *Endo*'s holding with respect to the unique privacy protections under the Hawai'i Constitution should be overturned.

Indeed, *Dalton*, *Steffes*, and the remaining cases cited by the majority are unpersuasive inasmuch as this court has independently analyzed the protections for individual liberties provided under the Hawai'i Constitution. *See Torres*, 125 Hawai'i at 396, 262 P.3d at

17. The majority also cites to the opinion of the Ninth Circuit Court of Appeals in support of its holding that "scrivener's errors" do not render a search warrant invalid. Majority's opinion at 395–96 n. 21, 319 P.3d at 314–15 n. 21 (citing *United States v. Hitchcock*, 286 F.3d 1064, 1072 (9th Cir.2002)). As explained at length *supra*, it is axiomatic that the Hawai'i Constitution provides greater protections for individual liberties than the Fourth Amendment to the United States Constitution. *See Dixon*, 83 Hawai'i at 23, 924 P.2d at 191 (1996). Moreover, the Ninth Circuit

states that "[t]he good faith exception has no application ... where there is no dispute about the search warrant's validity." *Hitchcock*, 286 F.3d at 1072. However, under Hawai'i's jurisprudence, where a warrant is misdated, as here, there is a dispute about the search warrant's validity. *Hitchcock*, however, adopts a position similar that of the other states' decisions cited by the majority, *infra*, that are rejected herein. Inasmuch as this court is interpreting the bill of rights of *the Hawai'i Constitution* in this case, federal cases are not controlling or persuasive.

1020 ("[I]t would seem apparent that the question of whether or not the privacy rights of a defendant who is tried in our courts and under our penal law have been violated, should not be governed by the law and constitution of jurisdictions that have deemed privacy rights irrelevant."). As stated, the Hawai'i Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures <u>and invasions of privacy</u> shall not be violated[.]" Haw. Const. art. I, § 7 (emphasis added).

For example, the Oregon Constitution contains no such language regarding the right to privacy. *See* Or. Const. art. I, § 9. Thus, the majority's citation to *Dalton* and *State v. Radford*, 223 Or.App. 406, 196 P.3d 23, 26 (2008), two Oregon cases, is inapposite on this basis alone.[18] The majority's citation to *Heard v. State*, 272 Ark. 140, 612 S.W.2d 312 (1981), *see* majority's opinion at 384, 319 P.3d at 303, is inapposite for the same reason, in that the Arkansas Constitution similarly does not contain an explicit right to privacy. *See* Ark. Const. art. II, § 15.

The majority also cites to a case from South Carolina, *State v. Shupper*, 263 S.C. 53, 207 S.E.2d 799, 800–01 (1974), a case from Louisiana, *State v. E.J.F.*, 999 So.2d 224, 231–32 (La.Ct.App.2008), and a case from Illinois, *People v. Deveaux*, 204 Ill.App.3d 392, 149 Ill.Dec. 563, 561 N.E.2d 1259, 1263–64 (1990), in support of its position. Majori-

ty's opinion at 384–86, 319 P.3d at 303–05. Unlike Hawai'i, however, the "good faith" exception is recognized in South Carolina, Louisiana, and Illinois.[19] The fact that these states recognize the good faith exception only highlights the majority's departure from the jurisprudence in Hawai'i with respect to the warrant requirement, and emphasizes that case law from those jurisdictions should not be followed in this court's consideration of the instant case.

Finally, Montana's constitution does contain a constitutional provision recognizing the right to individual privacy, *see* Mont. Const. art. II, § 10, which has been interpreted to "yield to a compelling state interest[,]" which "exists where the state enforces its criminal laws for the benefit and protection of other fundamental rights of its citizens." *State ex rel. Zander v. District Court*, 180 Mont. 548, 591 P.2d 656, 660 (1979). However, in *Steffes*, the Montana court's conclusion that the search warrant was valid stemmed from a Montana statute specifically providing that no search and seizure shall be illegal if "any irregularities in the proceedings do not affect the substantial rights of the accused." 887 P.2d at 1210 (quoting Mont.Code Ann. § 46–5–103 (1989)). While it is true that statutes cannot override constitutional protections, by citing to the Montana statute in *Steffes*, the Montana court effectively construed the privacy protection in Montana's Constitution to

---

**18.** Furthermore, *Dalton's* holding that the inadvertent misdating of the warrant "did not frustrate the constitutional objective served by the statutory requirement that search warrants be dated and executed within five days of their issuance[,]" 887 P.2d at 379, was in connection with a constitution that does not contain a specifically articulated right to privacy. Further, in *Radford*, although the Oregon court noted that there was "no explicit constitutional requirement for a particularized date ...," 196 P.3d at 26, there was also, significantly, no constitutional provision in the Oregon Constitution regarding the right to privacy.

**19.** *See State v. Covert*, 368 S.C. 188, 628 S.E.2d 482, 487 (S.C.Ct.App.2006) (noting that the South Carolina Supreme Court recognizes the good faith exception); *State v. Maxwell*, 38 So.3d 1086, 1091–92 (La.Ct.App.2010) ("In any event ... even if the warrant were to found to be deficient, the seized evidence may nevertheless be admissible under the good-faith exception of

*Leon.")*; *People v. Tunnage*, 162 Ill. 299, 310 (Ill.1994) (applying the U.S. Supreme Court's good-faith analysis from *Leon*). The majority asserts that these citations, illustrating that South Carolina, Louisiana, and Illinois have adopted the "good faith" exception, "involve an application of a "good faith" exception analysis only after determining that the warrant was invalid. Majority's opinion at 395 n. 21, 319 P.3d at 314 n. 21.

However, our jurisprudence clearly establishes that the warrant in this case was per se <u>invalid</u> because it was mis-dated. *See Endo*, 83 Hawai'i at 94, 924 P.2d at 581. Thus, in our jurisdiction, upholding a mis-dated warrant would constitute an application of the "good faith" exception where it has been previously rejected. Ultimately, how the "good faith" exception is applied or formulated in other jurisdictions is irrelevant, since, as noted, *Endo* would hold the warrant was invalid. *See id.* at 93–94, 924 P.2d at 581–82.

afford protections only to the extent provided by the statute. In contrast, *Endo* construed Hawai'i's similar constitutional provision as providing greater protections to its residents. 83 Hawai'i at 94, 924 P.2d at 588 ("[W]e concluded that the Hawai'i Constitution does not permit the validation of searches pursuant to search warrants that are facially expired when the searches are made."). Thus, as noted, *Endo* explicitly rejected *Steffes*. *Id.*

With respect to the consideration of these ancillary cases, it is worth reiterating that court is the "'ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution[.]'" *State v. Viglielmo*, 105 Hawai'i 197, 211, 95 P.3d 952, 966 (2004) (quoting *State v. Arceo*, 84 Hawai'i 1, 38, 928 P.2d 843, 870 (1996) (quoting *State v. Wallace*, 80 Hawai'i 382, 397 n. 14, 910 P.2d 695, 710 n. 14 (1996) (quoting *State v. Hoey*, 77 Hawai'i 17, 36, 881 P.2d 504, 523))). Consequently, the jurisprudence of these varying jurisdictions has been rejected in connection with this court's final determination of the issue before us.

### VII.

Adopting the good faith exception, as the ICA seems to suggest in its opinion and as affirmed by the majority, would undermine the three purposes of article I, section 7. *Endo* declared that "unlike its federal counterpart, article I, section 7, specifically protects against 'invasions of privacy.'" 83 Hawai'i at 93, 924 P.2d at 587. The right to be free from unreasonable searches and seizures is a personal right under the Hawai'i Constitution. *See Lopez*, 78 Hawai'i at 446, 896 P.2d at 902. The good faith exception would thus abrogate the strong privacy protections embodied in our constitution. *See Torres*, 125 Hawai'i at 396, 262 P.3d at 1020.

The exclusionary rule also serves to encourage officers to be careful in not only the preparation, but also the execution of search warrants. As *Endo* states, this court must consider "the desire to motivate the officials who prepare, sign, and execute search warrants not to prepare, sign, and execute facial-

ly expired search warrants." 83 Hawai'i at 94, 924 P.2d at 588. If officers were able to rely on the good faith exception, they would have no legal incentive to ensure the validity of a warrant, for, under the majority's and the ICA's view, issuance by a judge itself may be enough to excuse any mistake on the face of the warrant.[20]

Finally, as noted *supra*, allowing the use of illegally seized evidence can only undermine the integrity of the judiciary. Adopting the good faith exception would leave individuals whose constitutional rights have been violated without a judicial remedy, transforming article I, section 7 into a meaningless provision. In this case, none of the purposes supporting the exclusionary rule were served. As in *Kahoonei*, "to hold otherwise would needlessly erode one of the fundamental objectives of ... article I, section 7 of the Hawai'i Constitution, that is, to deter government agents from bypassing the warrant requirement." *Kahoonei*, 83 Hawai'i at 132, 925 P.2d at 302.

### VIII.

In light of the foregoing, I would hold that the warrant in this case was invalid, and in confirmation of the purposes behind the exclusionary rule, that the evidence obtained pursuant to the warrant must be suppressed.

---

**20.** *See also State v. Guzman*, 122 Idaho 981, 842 P.2d 660, 671–72 (1992) (holding that one of the purposes of the exclusionary rule is to ensure police officers carefully review warrants).